LATIMER v. EQUITABLE LOAN & INVESTMENT CO. et al.

(Circuit Court, W. D. Missouri, C. D. July 9, 1897.)

No. 2,181.

1. BUILDING AND LOAN ASSOCIATIONS—PAYMENT OF STOCK.

Under Rev. St. Mo. § 2810, which provides for the payment of the capital stock of building associations in installments, as the by-laws shall prescribe, but authorizes the directors, in their discretion, to allow interest not exceeding 8 per cent. "on such installments as are paid in advance," such an association has authority to receive full payment in advance, and issue paid-up stock bearing interest at 7 per cent.

2. SAME—RIGHT OF WITHDRAWAL.

The statutory right of a stockholder in a building association to withdraw therefrom after giving 30 days' notice, and to receive back the amount paid in by him, together with his share of the profits (Rev. St. Mo. § 2810), is one evidencing a public policy, and cannot be waived, even by an express declaration in the certificates that there shall be no right of withdrawal until 100 months from the issuance of the stock.

3. SAME—PREFERRED STOCK.

Building associations are established on a system of perfect equality and mutuality between all their members, and hence an association organized under Rev. St. Mo. art. 9, c. 42, has no power, in the absence of express provision to that effect, to pledge part of its assets for the payment of one class of its stock in preference to others.

This was a bill in equity by W. A. Latimer, receiver of the First National Bank of Sedalia, against the Equitable Loan & Investment Company and Adam Ittel, to enforce the alleged right of a stockholder to withdraw from the association. The cause was heard on demurrer to the bill.

Wm. S. Shirk and Montgomery & Montgomery, for plaintiff.
G. W. Barnett and J. H. Rodes, for defendants.

ADAMS, District Judge. The defendant is a loan and building association, organized under and subject to the provisions of article 9, c. 42, Rev. St. Mo. Section 2810 of such statutes enacts as follows:

"The capital stock of any corporation created under this article shall at no time consist of more than 10,000 shares of not less than $100.00 each. The installments on these shares are to be paid at such time and place as the by-laws shall appoint. The by-laws or the board of directors may, if they deem it advisable, allow interest not exceeding eight per cent. on such installments as are paid in advance. Every share of stock shall be subject to a lien for the payment of unpaid installments, fines and other charges incurred thereon, under the provisions of the charter and the by-laws. The by-laws may prescribe the form and manner of enforcing such lien. New shares of stock may be issued in lieu of the shares that have been redeemed, forfeited or matured. The stock may be issued in one or in successive series, in such amount and at such time as the board of directors, the shareholders or the by-laws may determine. Any shareholder, or the legal representative of any deceased shareholder, wishing to with-

draw from the said corporation, shall have the power to do so, by giving thirty days' notice of such intention to withdraw, such notice being given at a regular meeting of the board of directors. On the day following the next regular meeting or at any time thereafter, the member so withdrawing, or, if deceased, his legal representative, shall be entitled to receive, on demand, the amount paid in by him or her, and such proportion of the profits as the by-laws may determine, less all fines and other charges. Should there have been, however, a net loss, instead of a net gain, then such withdrawing shareholder shall receive the actual amount paid less his proportion of such net loss."

From the foregoing it seems plain that the general legislative scheme contemplates the subscription for stock, after the act of incorporation, in several successive series, such as may be determined by the shareholders, board of directors, or by-laws. These subscriptions are payable in installments, according to the requirements of the by-laws. These installments may be paid by subscribers in advance, and, when so paid, the subscribers, in the discretion of the board of directors, or as provided by the by-laws, may receive interest on such advance payments at a rate not exceeding 8 per cent. per annum. A peculiar feature of this scheme permits any stockholder who may have paid one or more installments to withdraw from the association at any time after having given 30 days' notice of his purpose so to do, and, on so withdrawing, to receive back from the association the amount paid in by him, with his proper proportion of the profits if any may have been made, or less his proper proportion of loss if such loss has been sustained. Apart from some other peculiar features, not necessary now to refer to, corporations created under this law are subject to the general principles of statutory and common law governing corporations.

The defendant, claiming to act under the power conferred by the statute of Missouri, on the 4th of September, 1890, issued its series of stock B, containing 500 shares, each for $200, representing an aggregate of $100,000 in par value. This series was issued as full-paid stock. It was not paid in installments of any kind, but in advance, for the full amount of its par value. The certificates representing this series recited, in substance:

(1) That dues in full for all the shares represented by them, at the rate of $1 per month on each share for the full period of 200 months, had been paid, or, in other words, that the par value of $200 per share had been paid by the holder.

(2) That the shareholder was entitled to redemption of his share at par on, and not before, 100 months from September 4, 1890, the date of the certificates, and also to receive, as his share of the profits and earnings of the business, interest at the rate of seven per cent. per annum.

(3) That there had been deposited with a trustee, of whom the defendant Titel is successor, securities, consisting of stock of the defendant corporation and deeds of trust on real estate, of the actual value of $110,000, to secure the ultimate redemption of this series of stock, and the payment of the agreed interest accruing thereon, semiannually, prior to its redemption.

The complainant is the owner of four of these certificates, each calling for five shares, or $1,000 in par value of stock. In his amended bill, the complainant sets forth the facts already detailed, and avers, further, that, by the provisions of the by-laws of the defendant company, the owners of full-paid shares of stock, like those owned by complainant, were entitled to withdraw from the association, and receive back the amount paid in by them, at any time, on giving 30 days'

notice of their intention to withdraw, in like manner as is provided for stockholders on the installment plan. Complainant next avers that he has given the required notice of his intention to withdraw, and that the defendant has refused to pay him back the amount paid in by him, and refused to recognize that he had any interest in the trust fund referred to in the certificates as pledged for the payment of the face value of these certificates. The bill prays for judgment against defendants, in favor of complainant, for the face value of his certificates, and that the trust fund aforesaid be specially charged with the payment of such judgment. To this bill a demurrer is interposed. This demurrer raises these questions: (1) Whether the certificates in question are for stock, and, if so, whether the defendant had power to issue full-paid stock, and obligate itself to pay a certain rate of interest thereon in lieu of profits. (2) Whether the holder of the full-paid stock has a right to withdraw from the company, and receive back his money paid, on giving the 30 days' notice prescribed by the statute, or whether he is concluded by the provisions found in the certificates to the effect that he is entitled to do so "on and not before 100 months" from September 4, 1890, the date of the certificates. (3) Whether the holder is entitled to any preferential right to the property undertaken to be pledged to secure the payment of these certificates.

Answering the first of these questions, it appears clearly that the parties to these certificates intended them to be capital stock, as distinguished from an evidence of money loaned. They are denominated capital. In the first place they confer upon the corporation power, averments of the bill, have, from the beginning, been treated as stock, with all the rights, in their holders, incident to ordinary stock, except as expressly limited in the certificate. This intention of the parties, unless outside the power of the defendant corporation, should be recognized and enforced. The question, then, is, did the defendant corporation have power to issue and deliver full-paid, interest-bearing stock? The legislation already adverted to, constituting the organic law under which the defendant is organized, provides a scheme primarily and prominently for paying the capital in installments, so long as such payments, taken in connection with other income, arising from fines, dues, interest, and profits, are necessary in order to bring the stock, in actual value, to par. But I do not think this primary and prominent feature or method of paying for stock is exclusive. The statute supra, in terms, provides that "the installments on these shares are to be paid at such time and place as the by-laws shall appoint." The by-laws or the board of directors may, if they deem it advisable, allow interest not exceeding 8 per cent. on such installments as are paid in advance. These provisions clearly contemplate a variation from the primary and prominent method of paying in the capital. In the first place, they confer upon the corporation power, in and by its by-laws, to fix the time and place of paying the installments. Obviously, under this grant of power, the installments might be few or many, and payable at one time or more. It appears from the bill that, pursuant to this grant of power, the defendant adopted a by-law referring to and recognizing paid-up shares of stock, and pro-

viding for their treatment and final disposition.    Again, a large and probably the largest source of income of associations like the defendant is in loaning their money.    They are relieved from the usury laws of the state, and may, in the form of premiums and otherwise, receive interest far in excess of the legal rates otherwise permitted. A necessary prerequisite to loaning money is to get it.    Accordingly, investors are encouraged to take stock, and pay the installments in advance.    They are allowed a fixed rate of interest, not exceeding 8 per cent., and the association receives the installments, some or all of them, in advance, and loans them out at a greater rate of interest than it pays, and in this way hastens the day of maturity of the stock, for the general benefit of its members.    The general scheme thus indicated, the clear reference to advance payment of stock found in the statute, the provisions relating to full-paid stock found in the by-laws, clearly establish the abstract power on the part of the defendant to receive payment of its stock in advance, and issue certificates of full-paid stock therefor.    If this power exists, reasonable terms and conditions of its exercise may be fixed by the by-laws or board of directors. The payment of stock in installments confers many possible advantages upon its holder.    He participates in the large premiums and interest received for money loaned, in the fines and other charges imposed upon associate members.    He receives a share in all the profits of the association, and this goes to expedite the maturity of his stock, or the profitable winding up of his financial venture.    These advantages or chances for gain do not appertain to the holder of paid-up stock.    In the nature of the case, he cannot apply his share of profits to the payment of his stock.    He takes no interest in the speculative feature of the venture.    He has money to invest, and is content with a reasonable interest thereon.    Considering all these things, I cannot doubt it was a reasonable exercise of power on the part of the defendant to fix the rate of interest payable to this class of conservative investors at 7 per cent. per annum.    I shall therefore hold that the defendant had power to receive payment in advance for the stock in question, to issue for it the certificates in question, and to obligate itself to pay interest thereon at the rate of 7 per cent. per annum, in lieu of permitting the holders of such certificates to participate in the profits of the business of defendant corporation.    This view finds ample support in authority.    Hohenshell v. Association, 41 S. W. 948; Missouri v. Equitable Loan & Investment Co. (Mo. Sup.; not yet officially reported) 41 S. W. 916; Towle v. Association, 75 Fed. 938; People v. Preston (N. Y. App.) 35 N. E. 979; Kent v. Mining Co., 78 N. Y. 159; End. Bldg. Ass'ns, § 462.

The next question to be considered is whether the complainant, as the owner of this full-paid stock, is entitled to exercise the right conferred by the statutes of Missouri upon stockholders, to withdraw from the association.    The statute provides, as already seen, that any shareholder wishing to withdraw from the association shall have power, first giving 30 days' notice of his intention, to do so.    Upon complying with this requirement of the statute, the shareholder is entitled to receive, on demand, the amount paid in by him, together with his share of profits.    It is contended by the plaintiff that he is

entitled to withdraw from the defendant corporation the amount of money paid on his certificates, to wit, the full face value, notwithstanding 100 months have not elapsed since the date of his certificates, and notwithstanding the special clause found in his certificates that they are not payable for 100 months from their date. This contention raises the question whether the statute permitting withdrawal at any time is to be treated as forming a necessary part of the contract, or whether the acceptance of a certificate with a clause curtailing the right of withdrawal to a period less than 100 months from date is binding upon a holder of such certificate. This right of withdrawal, and thereby ending one's relation to a corporation, is peculiar to building and loan associations. It does not appertain to corporations generally. The holder of stock of ordinary corporations must either transfer his membership to some purchaser of his certificate, or must retain his membership till the end of the corporate life of his company, or to such time as, by unanimous consent of the stockholders, liquidation may be agreed upon. He cannot force his company to purchase it, or otherwise, at his pleasure, withdraw his capital and portion of profits, and retire from the corporation.

The novelty and importance of this right of withdrawal are well expressed in Thompson on Building and Loan Associations. He says (page 64):

"One of the most important rights conferred upon a stockholder is the right of withdrawal. This right is incorporated in all statutes. A distinguishing difference between the stockholders of a building association and the stockholders in an ordinary private corporation is the right of the former, upon giving notice, to terminate future liability on his stock. He can arbitrarily devest himself of his membership, cut loose from the association, and end his duties and liabilities. In an ordinary corporation a subscriber for stock cannot obtain a cancellation of his subscription except by the unanimous consent of the other subscribers, and then he cannot do it if there were creditors whose rights would be jeopardized. Even a majority of the stockholders cannot withdraw and refuse to proceed further in a corporate enterprise; and these rules are said to be just, and based upon a sound public policy. The liberality of the legislative policy can be readily seen in making such a radical change in the law of corporations by investing the building association stockholder with the personal right of withdrawal."

The right of withdrawal, by the provisions and clear meaning of the statutes of Missouri in question, appertains to all shareholders, whether holders of installment-paying or full-paid stock. No distinction in this respect is made between them. By the organic law, the complainant, therefore, has a right to withdraw from the defendant company at his pleasure, and this right of withdrawal is the fundamental feature distinguishing defendant corporation and others like it from ordinary corporations. The question, therefore, is whether this important fundamental right conferred by statute can be waived by receiving certificates containing a curtailment of this right. I think not. If the corporation can issue one certificate or one series of stock curtailing this right of withdrawal, it can issue all of its certificates and all of its series of stock in the same way, and thus practically repeal the statute under which they take their corporate life.

Greenh. Pub. Pol. p. 502, declares the rule to be, in effect, that any contract by which the owner of corporate stock deprives himself of im-

portant rights secured to him by the statute, and which he acquires by virtue of his ownership of the stock under the statute, is void, and that such shareholder cannot waive it or contract it away.

In State v. Edwards (Me.) 29 Atl. 947, a customer agreed to pay more toll than the statute permitted the miller to take, and the court held the contract void, on the ground that the customer could not waive or contract away his rights under the statute upon which the miller was permitted to do business.

In the case of Insurance Co. v. Leslie (Ohio Sup.) 24 N. E. 1072, a question in relation to the waiver (by agreement found in the policy) of certain statutory provisions was considered. In deciding the case, the court, referring to these provisions, says:

"These sections were in force when the policy in suit was issued and entered into, and became part of the contract of insurance, fixed the measure of the obligation created by it, and control its construction and operation. * * * The statute rests upon considerations of public policy. * * * The statute cannot be treated as conferring upon the assured a mere personal privilege, which may be waived or qualified by agreement. It has a broader scope; it molds the obligation of the contract into conformity with its provisions, and establishes the rule and measure of the insurer's liability."

A large number of pertinent authorities are gathered together in this last-mentioned case, and they satisfactorily establish the general principle announced by the supreme court of Ohio.

See, also, to the same effect, Havens v. Insurance Co., 123 Mo. 416, 27 S. W. 718.

In the case of Wall v. Society, 32 Fed. 273, a question arose whether a statute of Missouri, providing that a policy of insurance should be nonforfeitable after two annual premiums had been paid, should prevail in a suit on a policy (executed in Missouri, while this statute was in force) which, by its terms, required the payment of three annual premiums before the policy became nonforfeitable. In other words, the question was very much like the one now before the court, namely, whether the contract of the parties as written should prevail, or whether the statute then in force should be so read into the contract as to prevail over its language. Judge Brewer, after announcing that he was disposed to rest his conclusion upon considerations of public policy, observes:

"It was evidently intended by its [the state's] legislation to provide a fixed and absolute rule, applicable to all cases,—absolute and universal,—because, if it applied only in cases in which the policies were silent, or if it could be waived or changed, a child can see that it would protect only so far as the insurance companies were willing. So, although no words of penalty are attached, no express denial of the right to waive, in fact no words of negation in any direction, yet it seems to me fair to say that the affirmative language of this statute discloses a public policy, which no court ought to question or refuse to enforce. The legislature has by this language declared a rule in respect to forfeitures in life insurance policies. It has thus established the policy which it believes should obtain in this state, and it is my duty to administer the laws of this state in the spirit in which they were enacted, and to uphold both their spirit and their letter."

The same conclusion is reached and expressed in the case of Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822.

In the light of these and many other authorities to which my attention has been directed, I am constrained to hold th·· ‘ the statutory

right of ending a stockholder's relation to a loan and building associ ation, by withdrawal therefrom, is a fundamental right, evidencing a public policy, which cannot be waived or contracted away by any one or more members of such association, and that the plaintiff in this case, having given the prerequisite notice, is entitled to recover the face value of his stock, notwithstanding the terms of his certificates postponing the exercise of this right until an unexpired term of 100 months shall have elapsed.

The next and last question to be considered is whether the complainant, as the holder of the certificates in question, is entitled to any preferential right in and to the property undertaken to be pledged to secure their payment. This must be answered by determining whether the defendant association had power to make the contract so pledging such property. "The elementary working principle of the building association scheme," according to Endlich (section 122, supra), is "a system of perfect mutuality and reciprocity and equality of all members." No provision is found in the organic law authorizing an association like the defendant to pledge any of its assets for the retirement or payment of any of its stock, nor is there any general power conferred by statute upon loan and building associations to issue preferred preferential stock, from which authority for pledging its assets to secure the payment of any of its stock may be inferred Under such state of facts, it must, in my opinion, be held that the pledge of corporate assets for the retirement or payment of a certain class of its stock, in preference to others, is so violative of the elementary requirement of equality and mutuality as to be absolutely void. Again, loan and building associations, like other corporations, may impair their capital and incur obligations to creditors. Capital is in all cases a trust fund, primarily for creditors. If the defendant association can be sustained in the issue of series B of its stock, amounting to $100,000, or one-tenth of its capital, and securing the payment of the same at par, with annual interest thereon at 7 per cent., by pledging sufficient of its capital therefor, I see no reason why it cannot issue all the balance of its stock in similar series, and in like manner secure the payment thereof. If this can be done, the creditors' trust fund is entirely diverted to the security of its stockholders. The fund which the law devotes primarily to creditors is, by action of others, diverted to a class which, under the law, is made second in the right to the fund. These last observations concerning the rights of creditors are not made because any creditors are now complaining of the conduct of the defendant company, but merely to illustrate the awkward predicament in which the views of complainant's counsel might involve the defendant company.

I feel largely relieved from an exhaustive consideration of this last question by the action of the supreme court of Missouri in the recent officially unreported case of State v. Equitable Loan & Investment Co. (Mo. Sup.) 41 S. W. 916. This was a proceeding by quo warranto to oust the defendant of its corporate franchise, because of its alleged unauthorized assumption of power in issuing full-paid stock, and securing the payment thereof by pledges of its assets. Sherwood, J., announcing the opinion of the court, says:

"It is quite apparent that the defendant association assumed and usurped franchises and privileges not granted it by the laws of Missouri in issuing full-paid stock, secured by pledges of other stock of said association, and also by deeds of trust to secure the redemption and payment of said full-paid stocks * * * that, though the defendant association had the right to issue full-paid or prepaid stock, there is nothing in the law under which the association was chartered that will authorize it to make this full-paid stock preferred stock, by using certain securities of the association to guaranty the payment thereof."

The foregoing is a construction placed upon the statute in question by the highest court of the state; and even if it were not in harmony with my views, which is not true, it would, under well-recognized principles, control my action. The plaintiff therefore is not entitled to any preferential right to the assets alleged to have been pledged to secure the payment of his stock. It appears from the foregoing that, if this were an action at law, the demurrer would not be well taken. The plaintiff would be entitled to a judgment against the defendants for the face value of his certificates. This action being in equity, and it appearing that the complainant is not entitled to equitable, as distinguished from legal, relief, the demurrer, for that reason, must be sustained.