[No. 2737. Decided February 15, 1898.]

J. H. DENNIS, *Appellant*, v. J. E. MOSES, *Respondent*.

SALES OF REALTY UNDER EXECUTION AND FORECLOSURE — CONSTRUCTION OF STATUTE — APPRAISEMENT LAW — DEFICIENCY JUDGMENT — POSSESSION DURING REDEMPTION PERIOD — WAIVER OF STATUTORY PROVISIONS BY DEBTOR — ATTORNEY FEES — MEDIUM OF PAYMENT OF DEBTS.

By construing together and harmonizing so far as possible the various seemingly incongruous provisions of the act of March 10, 1897 (Laws 1897, p. 70, Bal. Code, §§ 5273-5285, 5292, 5295-5298), the legislative intent is apparent therefrom to make provision for the appraisement of all property sold under execution or decrees foreclosing mortgage and other special liens held by private parties to the following effect: Where debtor and creditor cannot agree upon an estimate of value, the valuation shall be made by appraisers, and the property cannot be sold for less than eighty per cent. of such appraisement when incapable of partition, unless the amount of the debt be less, when it may be sold for such smaller sum; and, further, when the real estate is capable of division into parcels, the land may be sold by parcels,

whether under execution or foreclosure, though in case of foreclosure of liens the whole property covered by lien shall all remain as security for the debt until its satisfaction. (DUNBAR and REAVIS, JJ., dissent.)

  The statutory provision in the act of March 10, 1897, requiring an appraisement of real estate sold under execution or decree of foreclosure, cannot be waived in the contract creating the indebtedness sought to be enforced, but, after default, the debtor may waive a further appraisement upon notice given by the judgment creditor of his estimation of the value of the realty. (DUNBAR, J., dissents.)

  Code Proc. § 630 (Bal. Code, § 5890), which provides that a sale of mortgaged lands may be made forthwith, on the rendition of decree of foreclosure, is impliedly repealed by Laws 1897, p. 70, § 1 (Bal. Code, § 5273), providing that execution and foreclosure sales of real estate shall take place one year after levy. (DUNBAR, J., dissents.)

  The act of March 11, 1897 (Laws 1897, p. 98, Bal. Code, § 5888a), prohibiting deficiency judgments in all proceedings for the foreclosure of mortgages, is unconstitutional and void, as being an undue restraint upon the liberty of the citizen, affecting property rights. (DUNBAR and REAVIS, JJ., dissent.)

  The act of March 16, 1897 (Laws 1897, p. 227, Bal. Code, § 5299), granting to judgment debtors the right of possession, rents, issues and profits of real estate sold under execution, during the period of redemption, is one declaring a public policy, and cannot be waived by the debtor in the instrument creating the debt, though after default the law would permit a waiver.

  The provision of the act relating to sale of property under execution and decrees (Laws 1897, p. 70, § 1, subd. 3, Bal. Code, § 5273), declaring that sales of real property under execution shall be made one year after the filing of the levy, can only be waived by the judgment debtor after default, and a stipulation for an immediate sale after decree made in the instrument creating the debt is unenforceable, except insofar as a court of equity may be inclined to take cognizance of its provisions for enforcement or not, as seems just.

  The act of March 11, 1897 (Laws 1897, p. 91, Bal. Code, §§ 3665-3667), relating to the payment of obligations and providing that they may be satisfied with any kind of lawful money or currency of the United States, is void as an attempt to legislate upon a matter falling exclusively within federal jurisdiction.

  The act of March 11, 1895 (Laws 1895, p. 81, Bal. Code, § 5166),

authorizing the court to fix the amount of attorney fees in all cases where allowed, as the court shall deem reasonable, any stipulations in the instrument to the contrary notwithstanding, except that they shall not be fixed above the contract price, prescribes a measure of public policy and constitutes a valid enactment.

Appeal from Superior Court, King County.—Hon. ORANGE JACOBS, Judge. Reversed.

*John P. Hoyt*, and *Hastings & Stedman*, for appellant:

The court found as a fact that there had been included in the mortgage a clause by which the mortgagor had waived the right to have the mortgaged property appraised before sale and the right to possession thereof from the time of levy until the time for redemption had expired. But in its conclusions of law and decree it refused to give such waivers force for the reason that they were in violation of the act of March 10, 1897 (Laws 1897, p. 70), and therefore illegal and void.

The conclusion to which the court arrived in regard to the waiver of the right to have the property appraised before sale and of the right to possession until the time for redemption has expired, is erroneous for at least two reasons: First, because the stipulation in the mortgage by which these rights were waived is not in violation of the statute above referred to; second, if such statute must be so construed as to prohibit such stipulation, it is unconstitutional and without force to prevent the waiver.

1. All the statute in question does is to give the mortgagor or judgment debtor the right to have his property appraised before it is sold, and to remain in possession thereof until the time for redemption has expired. There is nothing therein, either in express language or general scope, which in any respect prohibits the interested party from contracting away or waiving such right, on the contrary,

it clearly appears from the act taken as a whole, that the rights are conferred for the benefit of the individual and may be waived by him. Section 13 of the act expressly provides that he may waive the year's delay by requesting that the sale be made at once. This shows that the right is that of the individual, and not of the public. And throughout the act will be found numerous expressions tending in the same direction. The general rule that any right which an individual has may be contracted away or waived, unless to do so would violate some statute or contravene public policy, is too well established to be questioned. It follows that before the right to so contract can be rightfully denied it must affirmatively appear that to do so is expressly prohibited or is in contravention of public policy. It is not claimed that the power to contract as to the rights under consideration is expressly prohibited, and it seems equally clear that the exercise of such power will not violate any general public policy. It has been held that the benefits of the homestead and exemption laws cannot be contracted away or prospectively waived, and to that effect are a majority of the cases, but in some of the states, notably Pennsylvania, the contrary doctrine is firmly established. The fact that there is a difference of opinion as to the right to waive the benefit of these laws, as well as the reasoning of the cases which hold that it cannot be waived, make it clear that the benefits of the statute under consideration can be contracted away or waived at the pleasure of the beneficiary. The reasoning of the Pennsylvania cases and the others which hold that exemptions can be waived, is most logical, and is founded on the idea of the fullest liberty of the individual to deal with his own property. That of the other class of cases is founded upon the idea of paternalism in the government, and it may well be that the former would in the end best subserve the public good. But it is not necessary to decide that question here, for the

reason that none of the cases have so extended the paternal
doctrine as to bring the protection of rights under this ap-
praisement law within its scope. Those under the exemp-
tion laws are held by one class of cases, above mentioned, to
be within it, for the reason that the public is interested in
the retention by the individual of the exempt property,
but rights under the statute under consideration are of an
entirely different character. They relate to all property
alike and apply as well to that of one having an abundance
of other property besides that allowed him under the ex-
emption laws as to one having no other property except
that which is the subject matter of the waiver. To hold
that the right to complete dominion over such property is
to be denied to its owner because a right incident thereto
has been conferred, is to do violence to every rule of statu-
tory construction. It might as well be claimed that land
or any other property granted to an individual by the gov-
ernment could not be disposed of by him even although
there was no restriction whatever in regard to such disposal
in the act making the grant or in any other statute. No
one will contend that full right of control and disposition
would not be vested in the owner of the granted property
in the absence of some restriction, and the same principle
will compel the court to hold that the individual has full
power to control and dispose of the rights conferred by the
statute under consideration. This statute simply grants
to each individual certain rights as to all his property, but
imposes no restrictions whatever upon their control and
disposal. Hence, under the general rule, above referred
to, they can be disposed of at pleasure. The public is no
more interested in the retention by the individual of his
rights under this statute, than they are in the retention of
any other right or property which he may possess. Hence
no consideration of public policy can influence the decision
of the question under consideration. It follows that there

is nothing to prevent the enforcement of these waivers, contained in the mortgage, and that the trial court erred in refusing to give them force. The foregoing conclusions are fully sustained by the authorities. The following cases all sustain the general principle contended for by appellant, and some of them decide the exact question here presented: *Stockmeyer v. Tobin*, 139 U. S. 176; *Insurance Co. v. Bagley*, 19 La. An. 89; *Desplate v. St. Martin*, 17 La. An. 91; *Stockwell v. Byrne*, 22 Ind. 6; *Wray v. Miller*, 20 Pa. St. 115; *Mitchell v. Freedley*, 10 Pa. St. 209; *Deam v. Morrison*, 10 Ind. 367; *Baker v. Roberts*, 14 Ind. 552; *Broadwell v. Rodrigues*, 18 La. An. 68; Herman, Executions, §§ 197, 257; 2 Freeman, Executions (2d ed.), § 284, and notes.

The case *Bank of Butte v. Bell S. & C. M. Co.*, 19 Pac. 403, and 156 U. S. 470, though not exactly in point, can be read with profit in the investigation of the question under consideration.

No case has been called to our attention which, considered in the light of the facts presented, tends to establish a contrary doctrine. When parties to a contract include in it a legal remedy by which it is to be enforced, such remedy cannot be changed and parties may by express contract stipulate that neither existing nor anticipated legislation shall in any wise affect or control their agreement. See *Taylor v. Stearns*, 18 Grat. 284; *White v. Crawford*, 84 Pa. St. 436. Under the legislation in Iowa it was held that the mortgagor was entitled to the possession during the redemption period, yet notwithstanding this holding the courts of that state did not hesitate to enforce provisions in mortgages which deprived mortgagors of this possession. See *Barrett v. Blackmar*, 47 Iowa, 565; *Myton v. Davenport*, 51 Iowa, 583; *Hill v. Hewett*, 35 Iowa, 563; *White v. Griggs*, 54 Iowa, 650. But even if the statute must be construed to prohibit the waiver of these rights it is without

force to affect them for the reason that thus construed it is unconstitutional and void.

· The right to contract as to property rights is as much property as the right itself. It is also a part of the liberty of the individual. Both are protected by the constitution of the United States and this state. See fifth and fourteenth amendments to the constitution of the United States, and section 3, article 1, of the state constitution.

The statute thus construed cannot be justified as a police regulation nor on grounds of public policy. The contract of waiver is not immoral or fraudulent; it was fairly made and for a sufficient consideration; the general public have no more interest in the right contracted away than they have in any other right of the individual. The contract does not affect the health, safety or welfare of the people. Hence it is harmless and the state has no right to prohibit its enforcement. There is no ground upon which the legislature has the right to prevent parties making contracts of this nature. See *Shaver v. Penn. Co.*, 71 Fed. 931; *Low v. Rees Printing Co.*, 59 N. W. 362; *Commonwealth v. Perry*, 28 N. E. 1126; *State v. Goodwill*, 10 S. E. 285; *Millett v. People*, 117 Ill. 294; *Leep v. Ry. Co.*, 25 S. W. 75; *Slaughter House Cases*, 16 Wall. 36; *In re Jacobs*, 98 N. Y. 106; *Ex parte Kuback*, 85 Cal. 274; *Palmer v. Tingle*, 45 N. E. 313; *Spry L. Co. v. Sault, etc., Trust Co.*, 77 Mich. 199; *Taylor v. Murphy*, 148 Pa. St. 337; *In re Eight Hour Law*, 39 Pac. 328; *In re House Bill No. 203*, 39 Pac. 431; *Schroeder v. Galland*, 134 Pa. St. 277.

Rents and profits of real estate may be mortgaged and the mortgage foreclosed and the property sold. See *Chase v. Ball*, 79 Ind. 311. If rents and profits may be mortgaged surely the possession of the property from which the rents and profits are derived may be waived in a mortgage covering the property.

In addition to the cases above cited we call attention upon this point to the following: *Storm v. Ermontrout,* 89 Ind. 214; *Buchanan v. Berkshire Ins. Co.,* 96 Ind. 510; *Hursh v. Hursh,* 99 Ind. 500; *Treat v. Dorman,* 100 Cal. 623; *Montgomery v. Merrill,* 65 Cal. 432; *O'Hara v. M. & O. Ry. Co.,* 75 Fed. 130.

3. The act of March 11, 1895 (Laws 1895, p. 81), in terms authorized the courts to set aside a contract of the parties which is not immoral or fraudulent, and is not against public policy, and for the reasons above stated and upon the authorities cited in support thereof it must be held to be unconstitutional and void.

4. The act of March 11, 1897 (Laws 1897, p. 98), is clearly unconstitutional. It interferes with the right to contract. It also deprives the court of the power to enforce a contract fairly made. It prohibits the taking of security for a debt without waiving the right to collect the debt in full though the debtor is abundantly able to pay. See authorities above cited; also, *Ramsey v. People,* 32 N. E. 364; *Harding v. People,* 43 N. E. 624; *Bracerville Coal Co. v. People,* 35 N. E. 62; *People v. Gillson,* 109 N. Y. 389; *People v. Marx,* 99 N. Y. 377; *Frorer v. People,* 31 N. E. 395.

5. Upon like grounds it must be held that the act of March 11, 1897 (Laws 1897, p. 91), is unconstitutional. It is also in contravention of section 10 of article 1 of the constitution of the United States, and for that reason void and without effect. See *Woodruff v. State,* 16 Sup. Ct. 820; 43 Central Law Journal, 155, 237 and 238; *Trebilcock v. Wilson,* 12 Wall. 687; *Bronson v. Rodes,* 7 Wall. 229; *Gregory v. Morris,* 96 U. S. 624; *Frank v. Colhoun,* 59 Pa. St. 386; *Dutton v. Pailaret,* 52 Pa. St. 109. See, also, as bearing on the subject: *Insurance Co. v. Thomas,* 104 Mass. 192; *Chrysler v. Renois,* 43 N. Y. 209; *Hittson v. Davenport,* 4 Colo. 169; *Myers v. Kauff-*

*man,* 37 Ga. 600; *Chesapeake Bank v. Swain,* 29 Md.
506.

*Humphries, Humphrey & Edsen,* and *McCardle & Jackson,* for respondent.

*Byron Millett,* as *amicus curiae:*

The questions involved in this case, as presented
by the record, relate to the force and effect that
shall be given to the laws known as the " appraise-
ment law " (Laws 1897, p. 70), the law regard-
ing the payment of obligations called the " anti-gold
contract law " (Laws 1897, p. 91), " the deficiency judg-
ment law " (Laws 1897, p. 98); whether the provisions
found in those statutes, may be controlled or waived by the
judgment debtor, by private contract; and also whether
the requirements of Laws 1895, p. 81, control the express
contracts or parties as to attorney's fees provided for in
the written instruments.

The Appraisement Law.—We think there is no question
but that this law applies to judgments rendered in foreclos-
ure suits, as well as in other actions. There is no other law
in force relating to the sale of real estate on execution in
this state. See section 10, and, also, 19, which repeals cer-
tain sections in 2 Hill's Code. The sections repealed re-
late to foreclosure cases and ordinary actions. See sections
513 and 520, 2 Hill's Code.

It is a well recognized rule of law, that constitutional
and legislative provisions enacted for a party's benefit may
be waived; unless such waiver violates some principle of
public policy. Many of the states adopted in their early
life, what the bench and bar have pertinently termed ap-
praisement, or valuation, laws, among which are Pennsyl-
vania, Indiana, Louisiana, Iowa, Kansas and Nebraska.
Every authority we have examined, from the federal and

state courts, sustain laws of that character, as applied to subsequent contracts.

In *Levicks v. Walker*, 15 La. An. 245 (77 Am. Dec. 187), the court uses the following language:

"Parties regulate their own conduct by their stipulations, but they cannot prescribe rules of proceeding for public officers, nor demand that the courts of justice shall depart from the usual modes of enforcing their decrees. If before judgment, the creditor may stipulate the manner in which the same shall be executed, the principle will sanction an endless variety of modes of execution of judgments."

The above principles have never been denied by the court of last resort in that state, or elsewhere that we are aware of. The court also held, in that case, that the appraisement could not be waived by the debtor; but on this point, it has since been held that the appraisement may be waived under a special provision of the Louisiana code, by stipulation between the parties interested. *Stockmeyer v. Tobin*, 139 U. S. 190, and cases cited in the opinion. In Indiana the statutes of 1843, p. 52, authorize the entry of judgments without relief from appraisement or valuation laws. See 1 Burns' Indiana Statutes, § 585; *Smith v. Doggett*, 14 Ind. 442; *Rawley v. Hooker*, 21 Ind. 144. The Pennsylvania statutes of 1836 authorized the waiver of inquisition (valuation). *Wray v. Miller*, 20 Pa. St. 115. *Mitchell v. Freedley*, 10 Pa. St. 198, 208, held that after the sale of property on process, the debtor by his conduct was estopped; and could not urge that an inquisition had not been made, to the prejudice of innocent parties, who had relied on the debtor's conduct in that regard. Kansas Laws, 1872, p. 105, authorizes waiver of appraisement, by stipulation. *Reynolds v. Qualy*, 18 Kan. 361; *Pierce v. Butters*, 21 Kan. 124. Iowa has a similar statute. *Holland v. Dickerson*, 41

Iowa, 361. The above authorities, from different states, afford strong negative evidence, that the debtor cannot waive the provisions of the appraisement law enacted for his benefit; unless the statute permits him to do so.

Our statute does not give him such permission, whether wisely or unwisely, is a matter of legislative expediency, with which the courts have nothing to do. The right of waiver in this regard ought to be denied on grounds of public policy. Strong analogous instances may be found in insurance cases, where the insured has attempted by stipulation to waive the provisions of a statute. *Wall v. Society*, 32 Fed. 273, was an action on an insurance policy, in the United States circuit court. It involved the question as to the proper force to be given to a Missouri statute, as against the express language of the policy. The court uses the following significant language:

"It was evidently intended by its (the state's) legislation to provide a fixed and absolute rule applicable to all cases—absolute and universal—because, if it only applied in cases in which the policies were silent, or, if it could be waived, or changed, a child could see that it would protect only so far as the insurance companies were willing. So, although no words of penalty are attached, no express denial of the right to waive, in fact, no words of negation in any direction; yet it seems to me fair to say, that the affirmative language of this statute discloses a public policy, which no court ought to question, or refuse to enforce. The legislature has, by this language, declared a rule in respect to forfeitures in life insurance policies. It has thus established the policy which it believes should obtain in this state, and it is my duty to administer the laws of this state in the spirit in which they were enacted, and to uphold both their spirit and their letter."

*State v. Edwards*, (Me.), 29 Atl. 947; *Havens v. Insurance Co.*, 123 Mo. 416; *Society v. Clements*, 140 U. S. 226; *Riley v. Franklin Ins. Co.*, 43 Wis. 449. On page

459 the court says: "Now the law is well settled, that where a statute is founded upon a public policy, a party cannot waive its provisions even by express contract."

This court, in *Mikelson v. Parker*, 3 Wash. T. 527, held that the provisions of the exemption laws of the then territory, could not be waived by the debtor by stipulation. It is true, that afterwards the statute, as found in 2 Hill's Code, § 489, permits a waiver in certain instances. The principle enunciated in this case is that such matters are wholly in the discretion of the legislature, acting within its constitutional authority. The appraisement statute having fixed a rule of public policy for this state, its essential provisions cannot be waived by contract.

2. Gold Coin Clauses.—The proposition whether the stipulations in the note and mortgage providing for the payment of gold coin shall prevail over the statute of 1897, p. 91, is not free from difficulty. On the one hand, we have the acts of congress, making silver and treasury notes legal tender for the payment of debts, public and private, except where otherwise stipulated in the contract. Gold coin is a valid tender under all circumstances. The power of congress is supreme over a given subject within its proper sphere. Section 10, article 1, U. S. constitution, prohibits the states from making anything but gold and silver coin a tender in payment of debts. U. S. Constitution, amendment 10, provides that:

"The powers not delegated to the United States by the constitution, nor prohibited by it to the states are reserved to the states respectively, or to the people."

I have been unable to find any authority, state or federal, which covers the exact point raised in this case. Judge Cooley, in his treatise on Constitutional Limitations, marginal p. 160, speaking of the duty of the court to declare a legislative. enactment unconstitutional, says:

" The task is therefore a delicate one, and only to be entered upon with reluctance and hesitation."

Again, at page 173, the author says:

" But when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the constitution of the United States, or of the state, we are able to discover that it is prohibited."

Now, this Washington statute does not fall within any of the inhibitions of the United States constitution, or of the constitution of this state; unless it conflicts with section 10, article 1, United States constitution, which recognizes the right of the state to make gold and silver coin a legal tender in payment of debts. The reason and spirit of this provision should be held to include the lawful money of the United States; or, in other words, any kind of money that the United States may lawfully issue. Such was evidently the intention of the founders of our government. But, in case of doubt, this court should uphold the law, as the presumptions under well recognized principles of jurisprudence are in favor of its constitutionality.

3. Deficiency Judgments.—The statute (Laws 1897, p. 91), prohibiting the rendition of deficiency judgments in foreclosure cases, as applicable to subsequent contracts, is remedial in its nature; it is clearly within the law-making power of the state; it relates to the procedure in the courts; it fixes a rule of state policy in that regard, which cannot be controlled or set aside by stipulation. See authorities cited above under point 1.

4. Attorney Fees.—The appellant's contention, that the court below erred in fixing the amount of the attorney's fee, to be taxed in this case, cannot be sustained. The statute (Laws 1895, p. 81), is explicit in its terms. Attorneys are officers of the court, whose fees are allowed in actions like the one at bar, as a part of the costs in the case. *Spies-*

*berger v. Thomas*, 59 Iowa, 606; *Gray v. Havemeyer*, 3
C. C. A. 497-506 (53 Fed. 174); *Churchman v. Martin*,
54 Ind. 380. An attorney is an officer of the court, who
accepts the office with its burdens and benefits. *Presby v.
Klickitat County*, 5 Wash. 329.

In conclusion we submit that the statutes involved in this
case, constitute parts of the contract between the parties
to this litigation, and should be read as expressly incorpor-
ated therein. *Van Hoffman v. Quincy*, 4 Wall. 550.

*B. F. Heuston*, as *amicus curiae:*

If the legislature by the acts in question intended to
prohibit the waiver of their provisions, I think it
had the power to do so, and that in such case
the acts would not be unconstitutional. In deter-
mining the intention of the legislature with reference to
the right to waive any of the provisions of the acts in ques-
tion, we have to look, first, to the language, and, if that is
not decisive, then to the rules of construction.

(*a.*) The act providing that debts shall be payable in
legal tender of the United States, notwithstanding any pro-
vision in the contract, of course is not subject to construc-
tion. A question of power only can arise, and it seems the
legislature had the necessary power, so that the law is valid
and must be enforced according to its terms. *Hancock v.
Yaden*, 121 Ind. 366 (23 N. E. 253).

(*b.*) The act relating to attorney's fees (Laws 1895, p.
81), is likewise not open to construction. For the reasons
stated in this brief the legislature had power to pass this
law, and therefore while it stands it establishes the rule as
to attorney's fees in all contracts. See *Churchman v. Mar-
tin*, 54 Ind. 380.

(*c.*) The remaining provisions of the legislation in ques-
tion contain no expression of the legislative intent as to the
right of parties to waive them, and therefore resort must be

had to the general rules of law and principles of construction to ascertain that intent. And on this subject the rule seems to be undisputed that if the provision confers a benefit upon a party in respect to a matter in which the public is not interested, the party may waive the provision. But, if the provision is designed to subserve a public use, its waiver will not be permitted.

(1.) On this subject the act limiting the operation of judgments to six years (Laws 1897, p. 52) appears to have a public purpose in view. In fact, it is a species of bankruptcy act. A party has six years after judgment in which to discover and exhaust his debtor's property against which the credit represented by the judgment was, theoretically at least, extended. At the end of that time the debtor, shorn of all his property, is permitted and encouraged to begin anew the production and accumulation of wealth—matters of the highest importance to the welfare and prosperity of the state. Those who feel morally bound to pay their debts are protected until they are able to do so, while others are spared the false pretenses and perjury incident to doing business in the name of some one else. There is no need of recounting the arguments for or against a bankruptcy law. It will be sufficient to say that when they are enacted they are in contemplation of law for the public good and not for the benefit of individuals.

(2.) The provision relating to the time when the mortgagee shall come into the possession of mortgaged property (Laws 1897, p. 227) seems also to be a matter of public policy, and hence cannot be waived in advance for the same reason that the penalty of the mortgage cannot be made absolute, except according to the established procedure of the state. The reasoning in the case of *Kneettle v. Newcomb*, 22 N. Y. 249 (78 Am. Dec. 186), seems to be conclusive of this subject. See in this connection *Teal v.*

*Walker*, 111 U. S. 242; *Cullin v. Foote*, 60 Minn. 6 (61 N. W. 818), all cited by respondent.

(3.) The act limiting the mortgagee to the security (Laws 1897, p. 98) does not seem to me to subserve any public interest recognized either in law or in political economy, and under the rule above stated, a party would be permitted to waive the provisions of the act thus made for his private advantage.

*Frank H. Rudkin,* as *amicus curiae:*

Counsel took the position that Laws 1897, p. 70, regulating the sale of property under execution, did not require the appraisement of mortgaged premises sold on foreclosure, but, in case appraisement was necessary, it could not be waived in the mortgage itself. Counsel then argued as follows:

When the statute declares that no real property shall be sold on execution except in the manner therein prescribed, assuming that the act applies to foreclosure sales, it does not, in my opinion, admit of an exception in favor of parties who have attempted to supersede the laws of the state by private contract. If parties may waive the benefits of one provision of the code, they may waive all; a contention which would scarcely seem to admit of argument.

The mode of sale prescribed by the statute forms a part of the right of redemption and, as a universal rule of law, the right itself cannot be waived in the mortgage, and the time and manner of its exercise, being a part of the right, cannot in my opinion be waived. That the statute is valid so far as mortgages executed subsequent to its date, assuming that it was intended to apply to such mortgages, will not admit of doubt. *Bronson v. Kinzie*, 1 How. 321. For these reasons, if it be held that the act in question was intended to apply to foreclosure sales, the court has only to decide what property is covered by the mortgage, what debt is secured thereby, and beyond this no private contract can

supersede or change a general law of the state.

For the same reasons, in my opinion, the parties cannot waive the time of sale fixed by the statute. Undoubtedly the owner of property can enter into any agreement in relation thereto, not prohibited by the statute. He has a twofold interest, the one covered by the ordinary mortgage in statutory form, reserving in himself the right of possession until after sale and foreclosure. He may, if he elect, mortgage both and place the mortgagee in possession, in which case the mortgagee will be entitled to retain the possession and to the use of the rents and profits until the debt is satisfied or, in a proper case, he may be entitled to the appointment of a receiver to collect the rents and profits until the judgment and sale can be had, but this does not depend absolutely on the agreement of the parties, but on other equitable considerations. But in the mortgage in question the rights to the possession and to the rents and profits are not dependent on the adequacy of the security or any other consideration of an equitable nature, but are attempts to control absolutely the procedure of our courts in derogation of the laws of the state, which in my opinion cannot be accomplished. I think the act in question was undoubtedly intended by the legislature as a measure of public policy and to permit such policy to be frustrated by a private contract would annul the very object the legislature had in view.

Another question presented in this case is the validity of the act forbidding deficiency judgments. It is very doubtful whether that question arises or not at the present stage of this case, as the court has no assurance at this time that the question will ever arise, but assuming that the question is properly before the court for decision, there would seem to be no doubt as to the validity of the statute. It is undoubtedly a limitation on the power to enter into pri-

vate contracts and such limitation might be carried far
enough to violate the fourteenth amendment to the consti-
tution of the United States. This amendment, among other
things, forbids the state to deprive any person of liberty or
property without due process of law, and an absolute pro-
hibition ·against entering into a private contract would, in
my opinion, deprive a citizen of both. Such prohibition is
inconsistent with liberty, and, if carried far enough, de-
structive of all property, but the act in question is only a
qualified limitation on the power to mortgage, and, while
its policy may be questioned, I do not think it violates any
provision of either the state or federal constitution. The
exemption laws of many of the states, and particularly of
Texas, are virtually a prohibition against real estate mort-
gages, but their validity as to future contracts has seldom
been questioned on constitutional grounds, and never, so
far as I know, denied.

It is perhaps true that homestead and exemption laws
stand on peculiar grounds. Doubtless the weight of author-
ity and perhaps of reason is to the effect that homestead and
exemption rights and privileges cannot be waived, for the
reason that it is of interest to the state to retain a home, and
the necessary articles of husbandry for each of its citizens,
lest they become public charges, mendicants or even worse.
The state being a party in interest, the right or privilege
cannot be waived without its consent. But, after all, the
power to prescribe the course of procedure in its courts nec-
essarily belongs to the state legislature, and it is the primary
judge of the demands of public policy in that regard. When
it has acted and laid down a rule of procedure for its courts,
it would be an extreme case indeed that would justify a
court in departing therefrom. For these reasons I do not
think the deficiency act is open to objection on constitution-
al grounds.

The only remaining question of a public nature is the validity of the act of the last legislature providing that all contracts may be satisfied in lawful money of the United States, regardless of their terms. This, in my opinion, was an idle attempt on the part of the local legislature to control a subject which the constitution of the United States wisely confided to other hands. The subject in its very nature is national in character, and one of the great objects of the constitution was to establish and maintain its uniformity throughout the Union, and in order to accomplish this all power of regulation and control over the currency was withdrawn from the state and conferred on the federal government. The right to have a debt paid in any kind of money, recognized as such by the laws of the United States, seems to me a right clearly guaranteed by the constitution of the United States, regardless of state laws. Passing over the legal tender cases and the cases on gold contracts which arose out of the legal tender acts, with which we are all familiar, the recent decision of the supreme court of the United States, in *Woodruff v. Mississippi*, 162 U. S. 290, would seem decisive on this point. Indeed the jurisdiction of that court could scarcely be maintained on any other ground, as the misconstruction of a state statute by a state court presents no federal question.

The opinion of the court was delivered by

SCOTT, C. J.—This action was brought to foreclose a real estate mortgage given to secure a note for $1,500 bearing interest at the rate of six per cent. per annum. The mortgage contained stipulations on the part of the mortgagor waiving all benefits under, and the provisions of, sectons 3 to 10 inclusive, of the act relating to sales of property under execution (Laws 1897, p. 70), and provided that in case of foreclosure the land might be sold forthwith as lands are sold on execution to the highest bidder without ap-

praisement, and without waiting one year as provided by
statute; also waiving the provisions of the deficiency judg-
ment act (Laws 1897, p. 98), and providing that in case of
non-payment of the note there might be a decree of fore-
closure against the mortgaged land, and a personal judg-
ment upon the note, and in case the land was not sufficient
to satisfy it that an execution might issue and be levied on
other property of the mortgagor. It was further stipulated
in the note and mortgage that the debt should be payable
only in gold coin of the United States of the present stand-
ard value, and that the decree and judgment thereon should
so provide, in contravention of the act relating to pay-
ment of obligations (Laws 1897, p. 91); also that the pur-
chaser at the foreclosure sale, or his successor in interest,
should have possession of the mortgaged land during the
time allowed for redemption, but should apply the rents
and profits upon the debt in case it was redeemed, the mort-
gagor waiving all right to the possession as provided by
the act granting judgment debtors right of possession dur-
ing the period of redemption (Laws 1897, p. 227). The
mortgage also provided in case of suit that an attorney's
fee of twenty per cent. upon the amount due should be in-
cluded in the judgment and in case of a settlement of the
suit before judgment an attorney's fee of $300 should be
payable, which calls in question the provisions of the act
regulating attorney's fees (Laws 1895, p. 81). The mort-
gage recited that the loan was obtained at a lower rate of
interest than would have been fixed were it not for the
stipulations and the waivers above stated. The lower court
found that they were all agreed to, but held that they were
all invalid and that there must be an appraisement, that
the land could not be sold for less than eighty per cent. of
the appraised value, that the remedy must be confined to
the property mortgaged, that it could not be sold before

the expiration of one year provided by statute, that the mortgagor should have possession meanwhile, that the debt could be satisfied in any kind of lawful money, and allowed an attorney's fee of ten per cent. instead of the one stipulated, whereupon the plaintiff appealed.

That some of the questions raised are of paramount importance is apparent. The general situation heretofore and now prevailing is well known and it is permissible to consider it for the purpose of arriving at the intention of the legislature in enacting some of the laws in question. Incident to the development of a new state it had been necessary for people to hire money, and this was done largely upon real estate security, such debts being in the main unsatisfied when said laws were passed, and the mortgages given to secure the same could not be affected thereby. If these laws are valid and must receive the construction contended for in some of the briefs, it is apparent that a large number of citizens will be prevented from negotiating loans and from obtaining a generally prevailing lower rate of interest than that previously existing, with which to satisfy present debts, or perhaps to obtain binding stipulated extensions of time upon such debts, or for the purpose of contracting new loans for building houses or constructing improvements. Homes might be lost thereby and the development of the state seriously retarded. They were helpless so far as existing mortgages are concerned, for such laws could not affect them injuriously, under both the state and national constitutions. There is no way of compelling new loans or extensions of either foreign or local capital. Realizing the great public interest centered in the decision of these questions and desiring to be as fully enlightened as might be, the court followed a practice sometimes adopted, of inviting other competent attorneys to express their views to the court on said matters, they not being interested

in the case. These gentlemen have courteously and ably responded, and, while in important particulars they have disagreed and while it will not be necessary to consider the argument presented upon some lines, it has been much to the court's assistance. The most important questions are those arising under the act relating to sales of property under execution, especially the matter of the appraisement, and the deficiency judgment act, as these are the most serious obstacles in the way of obtaining loans and renewals.

Arguments have been presented in several of the briefs to the end that the provisions of the act relating to sales of property under execution as to the appraisement of land do not apply in the case of mortgage foreclosures. In the case of *Swinburne v. Mills*, 17 Wash. 611 (50 Pac. 489), without entering upon an extended discussion of that point, the court expressed the opinion that owing to the use of the word "decree," etc., in the title of the act, and the direct reference to mortgages in section 10 (Bal. Code, § 5281), mortgages were included in the act, and that there must be an appraisement as to subsequent mortgages. There are other expressions of like import, such as sales "upon execution or by order of the court," in section 2 (Bal. Code, § 5285), and "upon the return of *any* sale of real estate or execution," in section 14 (Bal. Code, § 5292). Also, the evident intent of the act as a whole to deal with all sales of real estate at the suit of the private or individual creditor strengthens that conclusion and we follow it here. In the discussion of the *Swinburne case*, the court, after holding that the provisions of the act relating to an appraisement applied to mortgage decrees as well as to ordinary judgments, held that it was an impairment of the obligation of existing contracts and could not affect prior mortgages, following a long unbroken line of state and federal decisions, it being a prior mortgage there in controversy.

No attempt was made to interpret or construe the act further in that case, as it was not necessary to do so. But the substance of the entire act is largely involved in this case, for a construction of the particular parts questioned renders necessary a consideration of nearly all of it, to some extent, in order to harmonize and give effect to the whole.

It is a wholesome, well established rule that an act should be interpreted or construed to give effect to each of its express provisions, if practicable. In case of conflict, those susceptible of but one meaning will control those susceptible of two, if the act can thereby be rendered harmonious. The general purpose or spirit of the act must always be held in view and absurd or oppressive consequences avoided as far as possible. *State, ex rel. Chamberlin, v. Daniel,* 17 Wash. 111 (49 Pac. 243); *People v. Jaehne,* 103 N. Y. 182 (8 N. E. 374). Observing these rules, we enter upon the further consideration of this act. First going back to the necessity of an appraisement, we desire to call attention to section 16 of the act (Bal. Code, § 5296), which seems to have been unnoticed from the briefs. This section clearly recognizes that there are cases where no appraisement is required. To what sales does it apply? Section 3 speaks of an estimated value to be furnished by the judgment creditor, section 4 provides that if the debtor is not satisfied therewith he may except and give his estimate, etc., and section 5 provides that the creditor may demand an appraisement, if he is not satisfied with the debtor's estimate. But evidently section 16 did not intend to except those cases where no other appraisement than the first estimate, or estimates, was demanded. Because, if the debtor should except to the creditor's estimate and thus bring about the further appraisement provided for at the instance of the creditor, and section 16 means the appraisement provided for in section 5 (Bal. Code, § 5276), the debtor will

be punished for excepting to the creditor's estimate by cutting off one year of his period of redemption. For, if this is the appraisement that is meant and none is had, the deed would not issue until one year after confirmation. If an appraisement is had the deed issues immediately after confirmation. There would be no reason for providing two different periods of redemption to fit these cases and a cogent one against it. If section 630, vol. 2 of the Code (Bal. Code, § 5890), was not repealed so an immediate sale of mortgaged lands could be had, and it should be held that no appraisement was necessary, the same difficulty and inconsistency would remain as to ordinary judgments not constituting a lien until a levy is had, and if mortgaged lands must be appraised and an immediate sale can be had under section 630, the confirmation following right along, the period of redemption would be less than one year. The legislature evidently meant to provide a uniform period of redemption in these cases, whether the land was sold under an ordinary judgment or a mortgage or lien decree of foreclosure. There is no reason why an ordinary judgment creditor should have such a preference over a mortgagee or mechanic seeking to enforce his lien. While the words, "estimated value," are used in section 3, and "estimate," "valuation" and "appraisement" in section 4, and "appraisement" and "valuation" in section 5, they must mean the same thing, because no such absurd result with reference to the period of redemption could have been intended, if the appraisement as mentioned in section 16 only applies to the further appraisement provided for in section 5, and no appraisement in section 16 has reference to the estimates in sections 3 and 4 (Bal. Code, §§ 5274, 5275). These estimates are appraisements—the appraisements of the parties, and it may stop after either the first or the second estimate if the other party is satisfied. The appraise-

ment mentioned in section 5 is the final appraisement unless further proceedings are had under section 8 (Bal. Code, § 5279), where the matter seems to be finally and substantially left with the court under the power to compel a fair appraisement, etc. Section 16 in this respect evidently has reference to the next section — 17 — where it provides for certain sales without valuation. Valuation must mean appraisement or it means nothing, and if 16 and 17 (Bal. Code, §§ 5296, 5297) would control in this respect, in case of a sale by a city of land to enforce a street assessment proceeding the same uniform period of redemption of one year would be provided. Whether these would, or how far they would, control or repeal prior laws fixing different periods of redemption, as for instance section 41, p. 204, Laws 1893 (Bal. Code, § 815), is another question not to be decided here. The intention is one thing, the result another. The intention may or may not be accomplished.

The first provision of section 10 of the act is, "no property shall be sold for a sum less than eighty per cent. of the appraised value thereof except that when property is not capable of partition or division then the same may be sold for the amount of the judgment debt or demand." The second is, "when the property is capable of partition then so much thereof as may be sufficient only shall be sold to satisfy the judgment." The third is, "in case of foreclosure of mortgages or other liens nothing shall prevent the sale of the entire premises included within the mortgage or lien." The first clause provides for a sale for less than eighty per cent. of the appraised value, that is, if the debt should not amount to that much and the property is not capable of partition or division. The second provides that it must be partitioned, if it is capable of being divided, and only enough sold to satisfy the judgment. The third makes an additional provision as to mortgages and other

36—18 WASH.

liens. It provides that *nothing* shall prevent the sale of the entire premises included within the mortgage or lien. The other liens referred to are evidently other special liens, such as mechanics', material men's and laborers', the proceedings to enforce which are largely assimilated to mortgage foreclosures. The provisions of section 10, considered separately, are explicit and are susceptible of but one meaning, according to the expressed intent: It would seem that the first clause might stand without much qualification, considered with relation to the second clause. The last clause, if it means anything, according to its specific provisions extends a greater benefit to mortgagees and other special lienors. If there are several parcels or even one piece susceptible of division included in the mortgage, or covered by a mechanic's, laborer's or other such special lien, the whole may be sold for the amount of the debt, but not necessarily for a lump sum. The last part of section 2 provides, in case of the sale of real property consisting of several known lots or parcels, they shall be sold separately when demanded by the judgment debtor or subsequent incumbrancer. A subsequent purchaser of a part would doubtless have the same right. This is a well established rule everywhere under both the common law and general statutes, and it cannot be supposed for a moment that there was any intention to provide otherwise in this act.

The first provision of section 10 allowing sales for the amount of the debt must be accorded the right or power expressed, or it is meaningless. To set this aside, if not necessarily in direct conflict with some other express provision would be judicial legislation, and not construction. If hardships result thereunder it is a matter for the legislature to remedy, but we fail to see where its practical effects are likely to be injurious. Under the first clause an appraisement is necessary. Construed with reference to

the second, in case of an ordinary judgment, if a levy has been made upon several distinct parcels or if it is capable of partition or division, it must be divided and each part appraised, but when that is done, then under the first provision, in the case of an ordinary judgment levy, doubtless the tract having the smaller value, not being capable of further partition or division, may be sold for the amount of the debt, although the debt may not equal eighty per cent. of the appraised value. This construction gives effect to each clause of the act, and a direct and salutary effect to the matter of the appraisement. Under that, the sale must be for the full amount of the debt, if the debt is less than eighty per cent. of the amount of the appraisement. Thus the spirit of the act is beneficial and tends to prevent the sacrifice of property. It compels the judgment creditor to bid up to the full amount of his debt, if it is less than eighty per cent. of the appraised value, but it says to an ordinary judgment creditor, perhaps a common laborer, who could not avail himself of the laws giving liens in some cases, but who has obtained a judgment on his demand, where the debtor has but one piece of property not capable of being divided and largely in excess of his demand, that he may sell it for the amount of his debt. Of course he is not required to bid more than eighty per cent. of the final appraised value, if that is less than his debt. If there is no final appraisement he must bid the full amount of the preliminary appraisement under the act, if his debt amounts to that much. There is no hardship in this to the debtor class surely, for a man having a tract of large value under such circumstances could raise an amount sufficient to discharge a small obligation, or an amount sufficient to redeem his property within the time provided in case it is sold. In sales under decrees of foreclosure of mortgages, mechanics' and such special liens, where the

lien is given upon all the land included therein, by the contract or by the law it may all remain as security for the debt until it is satisfied. Where several parcels are included in the mortgage or in case of a mechanic's lien covering two buildings built under one contract, while a separate sale of each may be had, the mortgagee or lienor is not required to bid more than the amount of his debt upon all. That is, he may segregate his debt and bid a part on each parcel. He is not compelled to bid more than eighty per cent. of the final appraised value in any event upon any or all of it. He may buy for less, if his debt is less than eighty per cent. The same rule would apply as to the preliminary estimates as in the case of an ordinary judgment, making the amount the limit if the debt amounts to that much. But it would apply as to all of the property here. Otherwise no meaning could be given to the last clause of section 10, as there may be a separate sale of parts as we have seen. But under this provision they are all subject to the lien and for the amount bid. In the case of *State, ex rel. Purves, v. Moyer,* 17 Wash. 643 (50 Pac. 492), decided a few days after the *Swinburne case,* it was held that the provisions of the act requiring the levy of an execution did not apply in case of mortgage liens, on the principle that the law does not require the performance of an idle thing, and, the decree being a lien upon specific property, there was no necessity for a levy. In view of this holding it has been argued in some of the briefs that the provisions of the act relating to the postponement of sale do not apply, and that a sale of mortgaged lands may be had forthwith under sec. 630, vol. 2 of the Code (Bal. Code, § 5890). It was said in that case that the sale must be postponed, and we think correctly. While section 19 of the act expressly repeals sections 511 to 521, vol. 2 of the Code, relating to redemption, and does not by express declaration repeal other

laws in conflict with the act, and although repeals by implication are not favored, it nevertheless follows that conflicting prior laws must yield to later ones, and there would be a conflict here as to the time for redemption if an immediate sale could be had, an appraisement being necessary. Furthermore, it is objectionable to have a sale a year or so before title can be passed. This has been demonstrated under prior laws, and these are to be considered in construing remedial statutes. Consequently, in case of mortgages and other specific liens, no levy being required, the special execution or order of sale should not issue until the expiration of one year from the time of the rendition of the decree, or, if issued, the sale should not be had until a year has expired, the same as in case of an execution upon an ordinary judgment, to carry out the spirit and provisions of the act. The stipulations in this mortgage relating to immediate possession and right to rents and profits will be considered later. We have examined all the authorities cited and do not think the appraisement can be waived in the instrument itself. After default, when the situation becomes fixed, the act permits the debtor to waive a further appraisement upon notice given of the estimation of value by the judgment creditor. This would militate against construing the act to permit a waiver otherwise, or until default. The form would not be material. The discussion of the rents and profits provision will have a bearing upon this question also, as a measure of public policy to prevent the sacrifice of property.

The act, when considered with reference to itself, let alone other laws, is incongruous and difficult to understand. This is strikingly apparent from the briefs of those who have attempted to construe it. In making this criticism we do not desire to be understood as doing so in any captious spirit, for we appreciate the difficulties surrounding

the legislature when enacting laws, the more or less hurried consideration thereof rendered necessary, the want of individual training or education on such lines by a large number of the members, preconceived notions and tendencies of some, and the practical impossibility of carefully considering particular acts with reference to perhaps numerous other existing laws bearing on the same matters. A friendly sympathy should exist between the different branches of the government working for the common good. The general intention to do right should be accorded to all. Each fills a separate and useful field, but it is not saying too much to say that the greater safety of the people usually rests with the courts. All courts worthy of the name act deliberately upon well established lines, not swayed by popular impulse, and usually upon better information than legislatures have, and with better assistance, for courts are called upon to interpret and construe laws after they have been tested in the light of practical experience; they do not hesitate to correct their own mistakes; and they have a continuing and not a stated, periodical opportunity to do so. It happens occasionally with reference to legislative acts, and it is particularly true of this act, that the provisions are complicated and hard to reconcile.

If it were not for the clause authorizing a sale for the amount of the debt, it might be a question at least whether the act could stand where it might prevent a recovery at all by requiring the outlay or payment of a further sum by the creditor in addition to his debt in order to have a sale or enforce collection. In the cases examined, it is sufficient to say that we have found none where such a burden has been imposed. Somewhat similar statutes have been enacted in several states, but they vary from this one in essential particulars, and the decisions thereon have not been of much aid to us in construing it. If any of such

other acts have provisions authorizing a sale for the amount of the debt, such provisions have not been called to our attention. We have not seen any, but we have not examined particularly, as it is immaterial, for the act before us provides for it in unmistakable terms and this is the act we have to construe. In considering it we have called attention to some matters we have not attempted to decide, but for the purpose of showing that there may be some effect given to each provision, and that they have not been overlooked. The discussion of many points and our construction thereof regarding the act, and section 10 particularly, are rendered necessary under the mortgage here in controversy. The conclusion we have reached, while it differs materially from that contended for or suggested in the briefs attempting to deal with it somewhat in detail, seems to be the only one that will give a legitimate effect to each provision.

We will next consider the act entitled "An act relating to deficiency judgments" (Laws 1897, p. 98). Section 1 (Bal. Code, § 5888a) is as follows:

"That in all proceedings for the foreclosure of mortgages hereafter executed, or on judgments rendered upon the debt thereby secured, the mortgagee or assignee shall be limited to the property included in the mortgage."

Section 2 repeals all acts or parts of acts in conflict with it.

The discussions in some of the briefs view the act as prescribing a method of procedure. Looking only to the title of the act and the older and later practice relating to the foreclosure of mortgages, this would in a measure be justified. If it could be held to apply to a matter of practice only and to prohibit deficiency judgments in actions to foreclose mortgages, and the right remains intact to enforce collection of the deficiency in a subsequent suit or

to waive the security in the first instance and bring an or-
dinary action where there is a covenant to pay in the mort-
gage or a separate instrument contracting to pay, then the
question comes up, what measure of public policy can it
serve to prohibit a waiver? All agree that if it is a matter
of public policy it cannot be waived by the parties; if a
matter of private concern, it may be. It would be hard
to conceive of any public interest that would be promoted
in requiring a debtor to be subjected to the costs of two
actions. The cases mentioned in 2 Jones on Mortgages,
§ 1711, as to some states, would not apply here as such dis-
tinctions between the practice in equity and at law have
been abolished for a long period, and it can hardly be sup-
posed it was intended to take such a decisive step back-
wards and deprive the court of such power and compel a
resort to the old common law procedure in this particular.
It would be entirely foreign to the whole history and spirit
of our jurisprudence. Consequently, if the power to en-
force collection of a deficiency exists, the act as a method
of procedure must be intended to confer a private benefit
only, and its provisions can be waived. As limiting the
method of procedure it is clearly worse than useless.

But the act goes further than this, and is manifestly in-
tended for something else, and is so regarded in some of
the briefs. Its language is plain and not susceptible of the
construction that it was intended to prescribe a matter of
practice only. The body of the act distinctly limits the
right to enforce judgments on a debt for which mortgage
security has been given, to the property mortgaged, and
covers chattel as well as real estate mortgages. While it
might be void in this respect on the ground that the sub-
stance is not embraced within the title, graver constitution-
al questions arise. It affects more particularly local capi-
tal and business in relation to which chattel mortgage secur-

ity is often taken; also small urban loans upon real estate;
for it is a well known fact that the greater amount of capi-
tal invested in loans in the state belonging to parties resid-
ing without the state is invested in loans upon agricultural
lands, although loans have been made to some extent upon
town property, particularly large loans. It deprives a man
to a great extent of the benefit of his general credit, es-
pecially if he has but a small amount of property. For
instance, if he wanted to hire $500 to build a house or buy
tools to pursue a trade, he might find a man who was will-
ing to loan it to him by taking mortgage security upon
such property as he had with a further reliance upon his
individual credit and ability to pay. He might be capable
of earning good wages or have considerable property in ex-
pectancy, or prospectively. The party having the money
might not be willing to loan to him otherwise, but this law
says to him that if he takes mortgage security at all, his
remedy is confined to that and that only, regardless of the
amount of property the debtor may thereafter acquire, and
the result will generally be that the loan cannot be ob-
tained. As applied to farm lands there would not be so
great an objection to such a law for sufficient security can
be taken in the first instance. The value is stable and not
generally liable to destruction or serious impairment, but
in the case of improved town property it would be differ-
ent. It is no answer to say that its value could be protect-
ed by insurance policies, for it might be damaged in ways
a policy would not cover. Even agricultural lands might
be damaged by floods seriously in some localities, and dam-
age in various ways might happen without fault of either
of the parties. Furthermore, the title might prove defec-
tive and the debtor have no interest in the property, or in
case of a chattel mortgage upon live stock, the stock might
die and thus the remedy be lost entirely, or if it should be

held in such cases that the security having been lost the
debt should be regarded as one upon which no security had
been taken, then suppose in case of the real estate loan, a
small but inadequate interest remained in the debtor after
the real state of the title was determined, or in the case
of a mortgage upon several horses, all but one should die,
here there would be some security left, but mayhap insuf-
ficient to satisfy more than a small part of the  demand.
Under this law the remedy would cease when such property
was exhausted.

Here also a class seems to be singled out, arbitrarily, with
no apparent reason other than a matter of opinion, as the
law only applies to mortgage loans, not to other special liens
such as mechanics' liens or upon debts secured by a deposit
of collaterals.   A deposit of warehouse receipts would cre-
ate a lien upon the grain but the creditor would not be lim-
ited thereto in case it proved to be inadequate  security,
while in case of a chattel mortgage taken on like property
for a similar purpose another creditor would be.   In the
case of a lien of a material man furnishing lumber for the
erection of a building there would be no such limit, but
the groceryman who furnished the necessaries of life and
took mortgage security would be so limited.   Under this
law a man who holds a promissory note for which mortgage
security had been originally taken, but where such security
has become lost or impaired, is not given the same rights
that another citizen is who simply took a promissory note
without any security.   A law with some general terms may
be so hedged in with conditions and specifications as to limit
its application to a few citizens and make it class legisla-
tion.

Furthermore, that the right to contract with reference
to one's property is a property right is well settled, and any
abridgment of the enjoyment of the benefits flowing from

a contract not against public policy is void.

In considering the sweeping consequences of this act, it would seem to be a propitious time for a recurrence to fundamental principles. (Constitution, art. 1, sec. 32.) Civil liberty is defined by Blackstone to be

"No other than natural liberty so far restrained by human laws (and no further) as is necessary and expedient for the general advantage of the public." Book 1, p. 125.

Judge Cooley, in speaking of constitutional declarations, mentions

"Those declaratory of the fundamental rights of the citizen; as that all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness; that the right to property is before and higher than any constitutional sanction;" Cooley, Constitutional Limitations (5th ed.), p. 45,
and that

"In considering state constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. . . . there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition." Cooley, *supra*, p. 47.

As if to emphasize this principle our constitution, sec. 30, art. 1, declares that

" The enumeration in this constitution of certain rights shall not be construed to deny others retained by the people."

At page 198 of his work, Judge Cooley says:

"The fundamental maxims of a free government seem

to require that the rights of personal liberty and private property should be held sacred,"

and at page 200, quoting approvingly from a Connecticut case, says:

" 'With those judges who assert the omnipotence of the legislature in all cases where the constitution has not interposed an explicit restraint, I cannot agree,' "

but at page 205 says:

"Nor are the courts at liberty to declare an act void, because in their opinion it is opposed to a *spirit* supposed to pervade the constitution, but not expressed in words. 'When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something in the *spirit* of the constitution which is not even mentioned in the instrument,' "

and at page 206, speaking of the national and state constitutions, says:

"A legislative act cannot, therefore, be declared void, unless its conflict with one of these two instruments can be pointed out."

But while this is to be observed, it is apparent that all declarations, guaranties of right and limitations cannot be specific, and, unless general ones can be applied to such cases by necessary implication, they would be valueless.

Or, as said at page 432, quoting approvingly from the Dartmouth College case there cited:

" 'By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land.' "

At page 483 it is said:

" But a statute would not be constitutional which should proscribe a class or a party for opinion's sake, or which should select particular individuals from a class or locality, and subject them to peculiar rules, or impose upon them special obligations or burdens from which others in the same locality or class are exempt."

At pages 486-7 it is said:

" The doubt might also arise whether a regulation made for any one class of citizens, entirely arbitrary in its character, and restricting their rights, privileges, or legal capacities in a manner before unknown to the law, could be sustained, notwithstanding its generality. Distinctions in these respects must rest upon some reason upon which they can be defended—like the want of capacity in infants and insane persons; and if the legislature should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid to an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of *liberty* in particulars of primary importance to their 'pursuit of happiness;' and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived.

" Equality of rights, privileges and capacities unquestionably should be the aim of the law; and if special privileges are granted, or special burdens or restrictions imposed in any case, it must be presumed that the legislature designed to depart as little as possible from this fundamental maxim of government.

The state, it is to be presumed, has no favors to bestow, and designs to inflict no arbitrary deprivation of rights. Special privileges are always obnoxious, and discriminations against persons or classes are still more so."

As to class legislation, see, also, *Tacoma v. Krech*, 15 Wash. 296 (46 Pac. 255), where the principle was held to apply.

To undertake anything like a review of the numerous decisions on these constitutional questions would extend this opinion beyond all due bounds. Many of them are cited in the briefs and these can be resorted to by those desiring to do so. The rules above quoted are sufficient to indicate the general grounds and to establish that an act limiting the rights of a citizen to contract with reference to his property must tend to promote the public good in some way or it is an unwarranted interference therewith. Such laws must be founded on a legitimate reason. Where the reason fails the right ceases. Can such a basis be found here? The act cannot operate as an exemption law. Such laws are sustained on the principle that the state is interested in the retention by each citizen of enough property to enable him to be self-supporting, that he may be enabled to pursue his trade or calling and in order that he may not become a public charge. These matters are left to the legislature, and to say how little or how much may be exempted. Such laws are liberally construed. It clearly cannot serve any such purpose, for a mortgagor may have a large amount of other property above his exemptions aside from that mortgaged. Why should a mortgagee who has exhausted the mortgaged property not be paid therefrom? It has been heretofore a well settled policy of the law that a man's property in excess of his exemptions should be subjected to the payment of his debts. It could not be supported as an additional exemption, for it would operate

unequally. One man might have only a small amount of such property, another a very large amount. It is no answer to say that the parties have contracted for certain security, for that may be lost or impaired without the mortgagee's fault. The mortgagor has also contracted to pay the debt in addition to giving the security.

It does not serve the purposes of an insolvency law in any way whereby a man is enabled to turn over all of his property above his exemptions to all of his creditors and start again freed from former liablities, for here he is not absolved from the payment of his unsecured debts; if the property he then owns is not sufficient to pay them, payment may be enforced against his future acquired property. On the other hand, he may have property largely in excess of enough to pay all of his debts whether originally secured or not. It is not a marshalling of assets or like settlements of estates, as in the case of partnership and individual debts, for the originally secured creditor would have no recourse to the property left after unsecured debts are paid.

It cannot be sustained on the basis that an undue advantage may be taken of an unwary or needy debtor, where the law sometimes relieves him on the ground of public policy from his own stipulations, often carelessly entered into, or where he might be easily overreached, as in the case of a stipulation in an insurance policy that the agent shall be deemed to be the agent of the insured, for an instance. He has received the amount of the loan, if it is a case of hiring, and he has agreed to return it. If the mortgage is given to secure payment for the necessaries of life or tools of trade which he has purchased, he has agreed to pay for them, and it is a direct primary part of his contract. It does not tend to prevent the sacrifice of real estate, for the sale must be for the

amount of the debt or for eighty per cent. of the appraised value, if it is less. No one would contend that it in any way involves the police power of the state. It rests on none of these grounds. We know of no similar law anywhere and may safely say that none like it has ever been sustained in any state of the Union.

The results of a turbulent, restless, temporary impulse on the part of the people or majorities in any state or community may sometimes be reflected in contemporaneous legislation, which disregards the rights of individual citizens or classes. In such cases the people need protection from their own hasty acts. State constitutions are designed to serve as a check thereon. If they do not do this they are but a delusion and a snare. When constitutional rights are in issue, a great responsibility rests upon the courts. If they are unconstitutional, it is a duty to hold them so—one not to be avoided. It is not a matter of choice to act or not, but a duty is imposed which must be discharged. It would seem that if any law could be an unwarranted interference with a citizen's right to contract, this is one. If this law could be sustained, a law absolutely prohibiting all mortgages, debts or even the sale of property could as well be. We believe the opinion that such laws would be constitutional is not generally prevalent. In support of the proposition favored by a few, that legislatures are practically omnipotent and can interfere with the rights of the citizen under the constitution, imaginary cases are sometimes presented, such as if the legislature should pass bills repealing all laws providing remedies and substitute no others. Although the courts could not supply them as to future contracts, if they could hold former ones in force as to prior contracts, and while the constitution would afford but little protection in such cases, it is true, there is yet something inherent in the so-

cial organization itself which prevents them, resting in the settled good sense of the people. That any such thing, so destructive of society, would be done, is not to be thought of. Supposed cases, practically impossible because of their palpable outrageousness, can always be pursued to absurd ends in any direction. Our conclusion is that this law is void as being an undue restraint upon the liberty of the citizen affecting his property rights.

We will next consider the act granting judgment debtors the right to the possession of property during the period of redemption (Laws 1897, p. 227; Bal. Code, § 5299), together with the following clauses contained near the end of the mortgage here in controversy:

"That the purchaser at the mortgage foreclosure sale, or his successors in interest, shall have full and complete possession of the mortgaged property during the time allowed for redemption; and that the party of the first part and his successors in interest shall and do hereby waive all right or claim, allowed by statute, to possession during the period of redemption whether such period elapse before or after sale, but that whenever the property is redeemed the rents and profits shall be accounted for to the judgment debtor and credited as payment in part or in whole of the judgment.

"That from the time of the levy upon the real estate mentioned in the mortgage and the decree rendered in the foreclosure proceedings thereon the judgment creditor, being the party of the second part or his successors in interest, shall have full and complete possession of the mortgaged premises and be entitled to all rents and profits of the same; but that in case of redemption such rents and profits shall be credited upon the judgment."

It is contended that these provisions constitute a mortgage on the rents and profits which is binding. A mortgage may undoubtedly be given on rents and profits. 1 Jones, Mortgages (5th ed.), § 140; *Chase v. Ball*, 79 Ind. 311.

37—18 WASH.

And, if a substantial part of the agreement necessary for
the security of the mortgagor, should be enforced. A
mortgage in the form of a deed with a separate defeasance,
the deed giving immediate possession and the right to the
rents and profits, can doubtless be given, and it could be
made to take effect upon a default and foreclosure. But it
does not follow that such latter stipulations must be en-
forced in all cases. Courts of equity have always exercised
a control over sales of property even to the extent of dis-
regarding the stipulations of the parties. Rents and pro-
fits might be applied toward the satisfaction of a mort-
gage debt in the absence of such a stipulation as is some-
times done where a receiver is appointed before or after
default, nor do we say that it would be necessary that a
receiver should be appointed therefor in all cases. These
are matters over which the court has control and may or
may not enforce, as the justice of the particular case seems
to demand. The stipulations therefor may be in the nature
of forfeitures which are not favored. On a similar prin-
ciple stipulations regarding the time of payment, where it
is not of the essence of the contract, and as to damages, will
not always be enforced. 1 Pomeroy, Equity Jurispru-
dence (2d ed.), §§ 455, 456; 1 Sutherland, Damages (2d
ed.), §§ 283, 284. This is a familiar doctrine. The stipu-
lations in this mortgage as to rents and profits add little, if
anything, to the stipulation giving immediate possession
after the rendering of the decree. The right to possession
would take the rents and the law now would compel the
application of the profits to the debt in case of redemption.
It may have been but an attempt in this instance to evade
the law relating to possession during the redemption
period, not at all necessary for the protection of the mort-
gagee nor a substantial part of the contract. If so, the
mortgagor could not waive the right in the instrument cre-

ating the debt, or before default generally, when the situation becomes fixed and he is directly confronted with its effects. There was no showing in this case that the land was inadequate security for the debt. After default the law would permit a waiver. A debtor might waive his exemptions by failing to. claim the same after levy. This law declares a public policy and establishes a salutary rule. While it operates for the benefit of debtors, it also benefits the public by benefiting a large number of citizens. It is of the same class as those laws preventing waivers in insurance policies relating to agents and otherwise, which are well known, and also declaring after what performance life insurance policies shall be non-forfeitable regardless of stipulations. The law permits a mortgage of a homestead, and it might be a matter of public policy that the owner should not be turned out of possession immediately upon foreclosure. He might surrender possession after default and sale, but not be allowed to stipulate therefor in the instrument creating the debt. Greenhood, Public Policy, p. 496 *et seq.; Kneettle v. Newcomb*, 22 N. Y. 249 (78 Am. Dec. 186); *Peugh v. Davis*, 96 U. S. 337; *Levicks v. Walker*, 77 Am. Dec. 187; *Mills v. Bennett*, 94 Tenn. 651 (45 Am. St. Rep. 763, 30 S. W. 748); *Waters v. Randall*, 6 Metc. 479; *Queen Ins. Co. v. Leslie*, 47 Ohio St. 409 (24 N. E. 1072); *Cleghorn v. Greeson*, 77 Ga. 343. ˙ These matters must be left with the court, and there is nothing presented in this case to warrant our disturbing the finding of the court in that particular. This also disposes of the stipulation for an immediate sale after decree, as the law fixes the time as heretofore stated.

Regarding the act relating to the payment of obligations (Laws 1897, p. 91, Bal. Code, §§ 3665-3667), I desire merely to announce the conclusion reached by the other members of the court as I understand it, viz.: that it is

a subject upon which a state cannot legislate, but belongs exclusively to the general government. In its practical effects it is of no consequence, although the principle is an important one. The precise point as to whether a state can provide that no contract shall be enforced as payable in any particular money, but may be discharged in any kind of lawful money regardless of the stipulations of the parties, in the absence of national legislation permitting such contracts, does not seem to have been decided elsewhere. Personally, from the limited examination I have given it, in view of its present at least inconsequential effect and the opinion of the majority, I can see no objection to sustaining such a law. But it follows from the holding of the other members of the court that this contract must be enforced according to its terms, and that the act is inoperative.

We are all of the opinion that the act in relation to attorney's fees (Laws 1895, p. 81, Bal. Code, § 5166) must stand. This prescribes a measure of public policy. In the absence of any statute upon the subject it would be a matter over which the courts would have control, at least to the extent of refusing to allow unconscionable fees. It is also well settled that where no attorney has been employed there can be no recovery of an attorney's fee in the case, and it would follow therefrom that only a reasonable compensation should be allowed where one is employed. It is intended as a matter of costs to cover the expenses of suit. The practice of allowing the parties to fix the amount of such fees under the former statute was abused more or less. Excessive fees were sometimes fixed, and it is contended in the briefs that mortgages under arrangements made with attorneys were occasionally foreclosed for a much less sum, the mortgagee retaining the balance. This certainly was a reprehensible practice, and

one not to be tolerated. The finding of the lower court in this respect is sustained.

The judgment is reversed and the cause remanded for further proceedings in accordance herewith.

ANDERS and GORDON, JJ., concur.

DUNBAR, J., (dissenting).—I am reluctantly compelled to dissent in part at least from the majority opinion in this case. So far as the proposition of appraisement is concerned I am forced to the opinion that the law should be held to be of no force or effect by reason of its incongruities and contradictory provisions. Section 10 (Bal. Code, § 5281) provides that no property shall be sold for a sum less than eighty per cent. of the appraised value thereof except that when property is not capable of partition or division, then the same may be sold for the amount of the judgment debt or demand. The same section further provides that when the property is capable of partition then so much thereof as may be sufficient only shall be sold as will satisfy the judgment; and the further provision of the same section is, in case of foreclosure of mortgages or other liens nothing shall prevent the sale of the entire premises included within the mortgage or lien. It will thus be seen that the second and third provisions of the section are irreconcilably conflicting, for one provides that so much only of the property as may be sufficient to satisfy the judgment shall be sold, while the next sentence as clearly declares that nothing shall prevent the sale of the entire premises included within the mortgage or lien. I heartily concur in all that is said in the majority opinion concerning the relations existing between courts and legislatures, but when the legislature enacts a law the provisions of which are absolutely conflicting within themselves, then I think it becomes as much the duty of the court to

hold the law ineffectual for any purpose as it does to hold
the law unconstitutional when it plainly violates a consti-
tutional provision.    The section which I have quoted is
only one example of the conflicting provisions of this law,
if we hold that it applies to mortgages and not to execu-
tion sales alone; and an attempt to exempt mortgages from
the operation of the bill is rendered as unsuccessful by rea-
son of the provisions in succeeding and preceding sections.
There are no rules of statutory construction or of logic
which can be brought to bear in construing a statute of this
kind.    It simply becomes a question of guessing as to what
was the intention of the legislature, if indeed it does not
go further and compel judicial legislation, which is always
to be avoided. This is shown by the majority opinion, which
was announced after many weeks of painstaking labor,
coupled with an earnest endeavor to bring order out of
confusion, and to give *some* effect to the legislative act.
But I think the effort, devoted and praiseworthy as it was,
has failed, and that the announcement is really the best
judgment of the majority of what the law ought to be, a
result which, in my opinion, could not be avoided under
an attempt to sustain this law, and I think as a matter of
public policy it is far better that the laws enacted by
former legislators, who were the proper law-making pow-
ers, should be held to be the laws governing transactions of
this kind than a law which is the result of judicial judg-
ment and announcement.    I have read with interest the
masterly presentation made by the majority on the defi-
ciency judgment law, but am still constrained to believe
that on that subject the legislature had a right to act, and
that it did act within the scope of its constitutional powers,
and, believing that it is a provision which cannot be waived,
I think the law should be sustained.    I am also of the opin-
ion that the statute in relation to possession cannot be abro-

gated or modified by the courts, neither do I think it is a provision that can be waived. The majority opinion expresses my views on the money proposition.

REAVIS, J., (dissenting).—I cannot assent to several conclusions announced by the majority of the court in this case, and the importance of the questions involved requires further discussion. The question whether an appraisement of real estate provided for in the act of March 10, 1897 (Laws 1897, p. 70, Bal. Code, § 5273 *et seq.*), relating to the sale of property under execution is applicable to mortgages was decided in the case of *Swinburne v. Mills*, 17 Wash. 611 (50 Pac. 489), and mortgages were there held to be included within the terms of the act. Upon complete consideration we are all agreed that the conclusion heretofore reached was correct. This litigation arises in the construction of the mortgage in suit, which contains among its stipulations upon the part of the mortgagor an express waiver of the law relating to appraisement and time of sale; also the act of March 16, 1897 (Laws 1897, p. 227, Bal. Code, § 5299), declaring the mortgagor entitled to the possession and rents, issues and profits of real property sold under foreclosure during the full period for the redemption of the same; also the act of March 11, 1897 (Laws 1897, p. 98, Bal. Code, § 5888a), prohibiting a deficiency judgment in mortgage foreclosures; also the act relating to the construction of contracts between parties for attorneys' fees; and also the act of March 11, 1897 (Laws 1897, p. 91, Bal. Code, §§ 3665-3667), relating to payment of obligations, and declaring that the same may be fully satisfied with any kind of lawful money or currency of the United States. I understand the conclusion of the majority is that the waivers contained in the stipulations of the mortgage are void and cannot be enforced, but, as there is some intimation that a different state of facts

from those found in the present cause might vest in the court the consideration of the enforcibility of some of the waivers, I desire to make some observations upon this question. The learned counsel for the plaintiff contend that the provisions relating to appraisement and to possession, and the rents, issues and profits in the legislation of 1897 do not in terms prohibit the waiver; that, being solely for the benefit of the debtor, he may lawfully waive the same; that such contract of waiver is enforcible in the courts, and that public policy does not concern itself with those provisions intended merely for the benefit of the debtor. I have examined every case cited upon this proposition in the briefs submitted by counsel. *Stockmeyer v. Tobin*, 139 U. S. 176 (11 Sup. Ct. 504), was first determined in the state of Louisiana, and the supreme court of the United States merely accepted the construction of the state supreme court in *Broadwell v. Rodrigues*, 18 La. An. 68, and its ruling in that case is not authority here in any sense, because the uniform rule in the federal supreme court is to accept the construction of a state statute by the court of last resort of the state without reference to the correctness of such construction. As the Louisiana case just mentioned and also *New Orleans Mutual Ins. Co. v. Bagley*, 19 La. An. 89, are cases presented where the waiver of an inquisition or appraisement law has been held a valid contract, it is instructive to review the reasoning of the Louisiana court in an earlier case, *Levicks v. Walker*, 15 La. An. 245 (77 Am. Dec. 187). The court there held such a waiver void, and observed:

"Parties regulate their own conduct by their stipulations, but they cannot prescribe rules of proceeding for public officers, nor demand that the courts of justice shall depart from the usual modes of enforcing their decrees. If, before judgment, the creditor may stipulate the manner in which the same shall be executed, the principle will

sanction an endless variety of modes of execution of judgments."

But in the case of *Broadwell v. Rodrigues, supra,* the court again had brought before it the question of waiver in connection with the construction of section 2 of article 11 of the civil code of Louisiana, which had not been before them in the former case. Construing this section of the code, the court said:

" The law of France, in its practical application, differs but little from the law of Louisiana, and both rest on the maxim of the Roman law, which lays it down as a rule that every one is at liberty to renounce what the law has established in his favor and interests but himself.

" *Est regula juris antiqui omnes licentiam habere his quae pro se indicta sunt renunciare.* L. 29, *C. de Pactis.* But individuals cannot by their conventions derogate from the force of laws made for the preservation of public order or good morals. *I. C. de Pactis, 2; 3 L. 45, §§ de R. T. L. 38, §§ de Pactis, 2, 14.*

" Marcedé, commenting on the last rule cited observes: ' *Cet article en nous disant qu'on ne peut par convention déroger aux lois dont il parle, nous indigne assez qu'on pourra, par a moyen, déroger aux autres.*' Vol. 1, p. 671. And the jurisconsults who compiled our Code, while they adopted *verbatim,* the article 6 of the French Code, in the article 11 of our own Code, have added to that article a second paragraph which is a legislative recognition of Marcadé's doctrine, and has removed much of the uncertainty of the French article. (See, also, the doctrine of Toullier, hereinafter referred to.)

" The second paragraph of article 11 of our Code, is as follows: ' But, in all cases in which it is not expressly or impliedly prohibited, individuals can renounce what the law has established in their favor, when the renunciation does not affect the right of others, and is not contrary to the public good.' "

The court then says:

" Aided by the light which the French jurists have af-

forded us in solving this mooted queston, . . . this
we apprehend to be the general rule, as relates to the re-
nunciation of *private* rights. The exceptional cases are
those which trench on public order; and, within those ex-
ceptional cases, is not embraced, as we conceive, the stipula-
tion in the mortgage granted by the plaintiff in injunction."

It will thus be seen that the present Louisiana doctrine
does not in any sense overturn the principle first declared
in 15 La. An., *supra*, but is founded on a provision of the
Louisiana statute, which had theretofore been construed by
the French jurists, and such construction was accepted by
the court. I do not therefore think the cases cited from
Louisiana are authority upon the construction of the stat-
utes under consideration here.

The case of *Stockwell v. Byrne*, 22 Ind. 6, is founded en-
tirely upon estoppel of the judgment debtor who consent-
ed that an officer having charge of a writ of execution
should sell without appraisement, and the court held such
estoppel good. The case of *Baker v. Roberts*, 14 Ind. 552,
was a suit on a promissory note containing a waiver of val-
uation laws, and the decision was based upon a statute
which declared:

" Upon any instrument of writing, made in this state or
elsewhere, containing a promise to pay money without re-
lief from valuation laws, judgment shall be rendered and
execution had accordingly."

It will be noted that the Indiana cases cannot be in point
because special statutory permission authorizes the waiver
of valuation laws. The case of *Wray v. Miller*, 20 Pa. St.
115, was where the defendant was held estopped by a
waiver *after sale*. The sale was made without dissent and
the opinion states the presumption was that defendant re-
ceived the purchase money. In *Mitchell v. Freedley*, 10
Pa. St. 198, the defendants had estopped themselves after
judgment and sale had been made. Thus the Pennsylvania

cases are not in point, but it may be appropriately observed here that the courts of Pennsylvania stand almost alone in their construction of homestead and other exemption laws, and against the almost universal weight of authority in this country. But a Pennsylvania statute of 1836 seemed to authorize the waiver of inquisition or appraisement. On the validity of a waiver of the right to possession, several Iowa cases were cited, but I find in the last of those cases cited the decision based upon the Iowa Code of 1873, section 1938, which declares in the absence of stipulation to the contrary the mortgagor of real property retains the legal title and right of possession thereto. Manifestly the statute of Iowa determines conclusively the construction of such contracts for waiver of the right to possession.

It is a well recognized legal rule that constitutional or statutory benefits may be waived unless such waiver violates some principle of public policy. A number of the states, among which are Pennsylvania, Indiana, Louisiana, Iowa, Kansas, Nebraska and Illinois, in their early history adopted what have been very pertinently termed appraisement or valuation laws. Every authority from those states, both in the state and federal courts, has sustained the validity of these laws when applied to subsequent contracts. Having thus reviewed the authorities presented by counsel to sustain the validity of a contract of waiver of appraisement and found that in no instance other than when authorized by statute such waiver was enforced, we may now examine some of the numerous and very eminent authorities which hold that analogous provisions in other laws cannot be waived by private stipulation. Our statutes, it may be mentioned, nowhere authorize a waiver of any of the provisions of the laws under consideration.

*Wall v. Equitable Life Assur. Society*, 32 Fed. 273, was an action on an insurance policy in the United States cir-

cuit court. It involved the question as to the force to be given to a Missouri statute as against the express language of the policy. The court by Judge BREWER declared:

"It evidently intended by its (the state's) legislation to provide a fixed and absolute rule applicable to all cases —absolute and universal, because if it applied only in cases in which the policies were silent, or if it could be waived or changed, a child can see that it would protect only so far as the insurance companies were willing. So, although no words of penalty are attached, no express denial of the right to waive, in fact no words of negation in any direction, yet it seems to me fair to say that the affirmative language of this statute discloses a public policy. which no court ought to question or refuse to enforce. . . . The legislature has by this language declared a rule in respect to forfeitures in life insurance policies; it has thus established the policy which it believes should obtain in this state, and, though sitting on the federal bench, it is my duty to administer the laws of this state in the spirit in which they were enacted, and to uphold both their letter and their spirit."

This doctrine is also approved by the supreme court of the United States in *Society v. Clements*, 140 U. S. 226 (11 Sup. Ct. 822), and other cases in that court. *State v. Edwards*, 86 Me. 102 (29 Atl. 947, 41 Am. St. Rep. 528); *Havens v. Germania Fire Ins. Co.*, 123 Mo. 416 (45 Am. St. Rep. 570, 27 S. W. 718); *Reilly v. Franklin Ins. Co.*, 43 Wis. 449 (28 Am. Rep. 552). In the last case the court says:

"Now the law is well settled, that where a statute is founded upon public policy, a party cannot waive its provisions even by express contract."

In the case of *Minneapolis Threshing Machine Co. v. Beck*, 95 Iowa, 725 (63 N. W. 637), it was held that:

"Under Code, § 3100, providing that 'personal property levied upon and advertised for sale on execution must be

appraised before sale,' etc., such appraisement cannot be waived.

" Though it was stipulated in a chattel mortgage that the mortgagor waived appraisement, and the mortgagee was present at the foreclosure sale, the mortgagee is not precluded from moving to set aside the sale on the ground that there was no appraisement, as is required by statute."

The case of *Latimer v. Equitable Loan & Inv. Co.*, 81 Fed. 776, involved the right of withdrawal of a stockholder in a building association after giving thirty days' notice thereof, and to receive back the amount paid in by him together with his shares of the profits. The court held:

" The statutory right of a stockholder in a building association to withdraw therefrom after giving 30 days' notice, and to receive back the amount paid in by him, together with his share of the profits (Rev. St. Mo. § 2810), is one evidencing a public policy, and cannot be waived, even by an express declaration in the certificates that there shall be no right of withdrawal until 100 months from the issuance of the stock."

A strong analogy is also found in the uniform rule that the equity of redemption cannot be waived in a mortgage or in any other instrument executed at the same time. This has been the settled law for over two centuries in English and American courts. The supreme court of the Unites States in *Peugh v. Davis*, 96 U. S. 332, discussing the waiver of the equity of redemption, said:

" This right cannot be waived or abandoned by any stipulation of the parties made at the time, even if embodied in the mortgage. This is a doctrine from which a court of equity never deviates. Its maintenance is deemed essential to the protection of the debtor, who, under pressing necessities, will often submit to ruinous conditions, expecting or hoping to be able to repay the loan at its maturity, and thus prevent the conditions from being enforced and the property sacrificed.

" A subsequent release of the equity of redemption may

undoubtedly be made to the mortgagee. There is nothing in the policy of the law which forbids the transfer to him of the debtor's interest. The transaction will, however, be closely scrutinized so as. to prevent any oppression of the debtor." *Teal v. Walker*, 111 U. S. 242 (4 Sup. Ct. 420).

The language quoted is an answer to the proposition affirmed by counsel for plaintiff that the public is not concerned as to how much or when the property of the debtor is taken in foreclosure. The whole reasoning relative to the right to waive the equity of redemption and the principle upon which it is founded is applicable to the construction of the statute before us. The rule also held by the courts of equity from time immemorial that the mortgagor cannot waive at the time of the execution of the mortgage the right to the possession of the mortgaged premises during the period of redemption is analogous. This is for the special benefit of the mortgagor and the authorities have always been at one in refusing to enforce such waivers. But it has been argued that the statutes of 1897 relating to appraisement do not evince a public policy or the intention of the legislature to declare a uniform rule relative to sales under execution and foreclosure of all real estate at judicial sales. Section 3, Laws 1897, p. 71 (Bal. Code, § 5274), is mandatory in its language:

" It shall be the duty of the judgment creditor . . . when the judgment is to be satisfied in whole or in part from real estate, or any interest therein, to deliver to the sheriff a true statement, signed by himself or attorney, containing a description of the property levied upon, the estimated value of each separate description, and serve a copy upon the judgment debtor or his attorney."

Thus it will be seen that before the sheriff can take a single step under his execution after levy the appraisement must be made by the judgment creditor; it is a part of the process as necessary as the notice of sale; but if it were de-

sirable to derive the intention of the legislature from sur-
rounding circumstances and conditions then existing, it is
also easy to deduce the rule of public policy. For a few
years preceding the legislative session of 1897 it was a
matter of universal knowledge in this state that real prop-
erty exposed to sale under execution was sacrificed. A se-
vere financial stringency and absolute dearth of money in
general circulation destroyed the value of real property,
and at such sales generally the only bidder was the judg-
ment creditor, who in effect could and did bid so much as
he chose for property, and thus the mortgage which, when
executed, was deemed secured by property of thrice its
value frequently was purchased by the mortgagee for a
small portion of the amount secured, and a deficiency judg-
ment left standing against the mortgagor for the balance,
often the larger portion of the claim. It is plain to my
judgment that the legislature intended by these statutes to
prevent the undue sacrifice of property. Whether the sta-
tute is the best that could be framed for that purpose or
whether it is wise legislation are matters which the courts
cannot control. The question at the outstart ought to be
Is the statute constitutional? I understand the court is
agreed that the legislature has the power to enact such
laws. I have examined the numerous cases cited by coun-
sel upon the question of the constitutionality of this sta-
tute, and my conclusion is that with the exception of the
mechanic's lien and slaughterhouse cases all the cases cited
are those involving class legislation, and as such would
probably be held void under art. 1, sec. 12, of our consti-
tution. These cases hold the acts under consideration
void for the reason that they limit the right to contract
to certain classes, to-wit: *Shaver v. Pennsylvania Co.*, 71
Fed. 931 (railroad employés); *Low v. Rees Printing Co.*,
41 Neb. 127 (59 N. W. 362, 43 Am. St. Rep. 670), (all

laborers except on farms); *Commonwealth v. Perry*, 155 Mass. 117 (28 N. E. 1126, 31 Am. St. Rep. 533), (weavers); *State v. Goodwill*, 33 W. Va. 179 (10 S. E. 285, 25 Am. St. Rep. 863), (laborers in mines and factories); *Millett v. People*, 117 Ill. 294 (7 N. E. 631, 57 Am. Rep. 869), (coal miners); *Leep v. St. Louis Ry. Co.*, 58 Ark. 407 (25 S. W. 75, 41 Am. St. Rep. 109), (railroad employés); *In re Jacobs*, 98 N. Y. 106 (50 Am. Rep. 636), (cigarmakers in tenement houses); *Ex parte Kuback*, 85 Cal. 274 (24 Pac. 737, 20 Am. St. Rep. 226), (employés on public contracts); *In re Eight Hour Law*, 21 Colo. 29 (39 Pac. 328), (laborers in mines, factories and smelters); *In re House Bill No. 203*, 21 Colo. 27 (39 Pac. 431), (coal miners).

The statutes here in question embrace all those entering into the relation of debtor and creditor, which is not only a relationship based upon its own peculiar characteristics, but is one recognized from the earliest times and under all forms of constitutions as subject to legislative control without the suspicion of being answerable to the charge of class legislation. The objection to the constitutionality of the provisions relating to appraisement being untenable, the important duty of the court is their construction.

2. And here I am unable to agree with the construction of the majority of the court. I concede that section 10 of the appraisement act is inartificially framed, and there is much difficulty in the harmonious construction of the several provisions included in the section. Section 2 provides, when the sale is of real property and consisting of several known lots or parcels, they shall be sold separately when demanded by the judgment debtor or a subsequent incumbrancer. This is merely declaratory of an ancient equitable rule in mortgage foreclosures. The act is clear

in the procedure on the appraisement. It is simple and direct. If the judgment creditor's appraisement is satisfactory, notice of sale is given; if not satisfactory to the judgment debtor, then the appraisers are appointed by the clerk of the court and they shall appraise the real value of the property or interest of the judgment debtor therein. Section 8 (Bal. Code, § 5279) seems to commit finally the fairness of the appraisement and the propriety of another valuation of the property to the court. The difficulty in construction is found in section 10 (Bal. Code, § 5281). I think this section may be fairly read as follows: no property shall be sold for a sum less than eighty per cent. of the value thereof. All that follows in section 10 are exceptions or provisos. The well recognized canon of statutory interpretation, that in the event of absolute repugnancy between a proviso and the body of the section and intention of the whole act, the proviso must yield, ought to be applied here, and the exceptions or provisos taken together would qualify the section that the property cannot be sold for less than eighty per cent. of the appraised value, the whole thereof may be sold if necessary to pay the debt at eighty per cent. of the appraised value, but if a portion of the property appraised at eighty per cent. will pay the debt no more can be sold. *State, ex rel. Chamberlin, v. Daniels*, 17 Wash. 111 (49 Pac. 243). As I view the construction given to section 10 by the court, the whole appraisement is so emasculated that nothing of value is left of it. The plain intention of all the preceding sections of the act is the appraisement of real property so as to avoid its sacrifice at the sale, and, while such legislation relating to execution sales is novel in this state, it is by no means new in the general legislation of our sister states. Very similar provisions relative to appraisement, as we have seen heretofore, existed in a number of the states, and one uni-

form intention pervaded all of them. There is nothing specially different in the results to the judgment creditor in our statutes from those found in the statutes of the other states. In fact we have in our probate procedure long recognized a control over sales of property for the satisfaction of debts. An appraisement is mandatory in all administration sales, and the court is by statute authorized to set aside any sales, if in its judgment upon a hearing a larger amount can be obtained for the property; and without any statutory provision the courts in the exercise of their equitable powers continually in receiverships fix limits upon the bids which shall be received for property offered at sale. This court has approved such an order when made by a superior court of property under mortgage foreclosure in the custody of its receiver. All the arguments used against the fairness of the statute are equally applicable to probate sales and to receivers' sales. As seen, section 8 of the statute reposes in the superior court the final determination of the fairness of the appraisement. Imaginable cases may be suggested where the appraisement might incidentally postpone the sale; but I think the general presumption of fairness in judicial procedure and that judicial officers will perform their duty will relieve the statute of any imputation of an intention to postpone collections on execution or to require anything but a fair sale of property.

3. The act relating to deficiency judgments (Laws 1897, p. 98) is clear and mandatory in its provisions and therefore not the subject of construction, and the only question litigated here is its constitutionality. As a mere question of procedure in a foreclosure suit it ought to be controlling. By legislative authority only in this state has the power to enter a deficiency judgment in a foreclosure of a mortgage been found. Without such sta-

tutes for authority to enter a deficiency judgment in the same proceeding, or where large discretion is given by equity rules, I think no court has entered such a judgment. But the broader question of the constitutionality of the statute which limits the recovery of the debt to the mortgage security has been fully discussed by counsel and by the court. It is objected that the statute is obnoxious, first, to article 5, section 1, and article 14, section 1, of the constitution of the United States, and article 1, section 3, of the constitution of Washington, in substance as follows: " No person shall be deprived of life, liberty or property without due process of law;" and second, to article 14, section 1 of the federal constitution, " No state shall make or enforce any law that shall abridge the privileges or immunities of citizens of the United States." Section 10 of article 1 of the federal constitution, that "no state shall pass any law impairing the obligation of contracts," has been cited. The latter citation is so manifestly not in point here that I do not deem it necessary to refer to it again. The first provision does not say that the state may not deprive a person of life, liberty or property and stop there, but declares that it shall not be done "without due process of law." The state is continually depriving persons of life, liberty and property, but it must be done according to due process of law.

" Due process of law does not mean a statute passed for the purpose of working a wrong." Cooley, Constitutional Limitations (1st. ed.), p. 353.

These words are held to be synonymous with the words " law of the land." *Ibid.*, p. 352, and this means—   •

" General public law, binding upon all the members of the community under all circumstances, and not partial or private laws, affecting the rights of private individuals or classes of individuals. *Millett v. People*, 117 Ill. 297 (7 N. E. 631, 57 Am. Rep. 869).

And it is also that law which hears and condemns only according to recognized judicial usages. The second constitutional inhibition against making or enforcing any law which will abridge the privileges or immunities of citizens of the United States has been frequently considered by the supreme court of the United States. In *Butchers' Union Slaughterhouse, etc., Co. v. Crescent City, etc., Slaughterhouse Co.*, 111 U. S. 746 (4 Sup. Ct. 652), Mr. Justice BRADLEY observes:

" I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

And the application of this article of the federal constitution has generally been directed against some discrimination by the state in favor of its own citizens and against other citizens of the United States. The protection of life, liberty and property and the enforcement of private rights has been uniformly held by the federal supreme court to devolve upon the state. The state unquestionably may regulate contracts between its citizens and control them as best accords with its own views of public policy, and it has always done this, and this policy may be changed at the will of the state so long as it does not impair the obligations of prior contracts. The questions relating to its policy have been in all our state constitutions committed to the legislative department of the government. In fact I believe almost without exception the English speaking race has entirely placed these questions within the domain of legislation. They belong to the field of political economy, morals and the general science of government, and people differ materially in their views upon them. At one time the legislature might deem it sound policy to encourage speculative loans of capital in the state. It might deem any exemption laws unwise. It might, as has heretofore been the rule,

by legislative enactment in this state provide that the possession of real property should go to the mortgagee before the period for redemption expired without such mortgagee's accounting for rents, issues and profits when redemption was made. It might, as was the law for some time of this state, abolish the equity of redemption in mortgages and in redemption of real estate sold at execution; and the court has uniformly sustained such enactments as being peculiarly within the power of the legislature. The state may also appropriately through the legislative department change such rules. It may deem speculative loans objectionable. It may deem exemption laws wise. It may determine that the equity of redemption in mortgage foreclosures shall be preserved in the future. It may provide for a redemption of property sold on execution or it may provide that contracts may be made between the borrower and lender of money at such rates as they choose; but if it should adopt other views it may appropriately through its legislative department limit the right to borrow money to a certain rate of interest, and may, in my judgment, regulate and control the contract of mortgage and limit the amount and value in security embraced in a mortgage and the amount of the recovery thereon. It has been held that a state might forbid the assignment out of the state of claims against the recovery of which the exemption laws of the state of the residence of the parties would be a protection: *Sweeny v. Hunter*, 145 Pa. St. 363 (22 Atl. 653); declare after what performance contracts of insurance shall be non-forfeitable: *Equitable Life Assur. Society v. Clements*, 140 U. S. 226 (11 Sup. Ct. 822); regulate the weight and price of bread: *Mobile v. Yuille*, 3 Ala. 140 (36 Am. Dec. 441); restrict the removal and sale of cotton in seed: *State v. Moore*, 104 N. C. 714 (17 Am. St. Rep. 696, 10 S. E. 143); declare that railroad and telegraph companies cannot by pri-

vate agreement divest themselves of liability for acts as such: *Liverpool & G. W. Steam Co. v. Phenix Ins. Co.*, 129 U. S. 397 (9 Sup. Ct. 469). But many illustrations might be offered of the principle that the regulation and control of contracts, and the procedure for their enforcement, are not inhibited by either of the two provisions of the federal constitution heretofore mentioned. I apprehend the true rule can be formulated thus: If a public policy is obvious from the statute and it is not arbitrary or partial its validity is assured. The public policy must be such as to induce the legislature to act, and its motives must not be merely whimsical and arbitrary, and the law cannot be merely partial but must affect all alike. Whether the policy inducing legislative action is wise does not come within the province of judicial inquiry. When the statute fairly discloses such a policy the act is valid, unless contravening some other constitutional provision. I think the policy of the act prohibiting a deficiency judgment in mortgage foreclosures is fairly deducible from the evident intention of the several acts which have been under discussion here and all enacted by the same legislature. We have seen the legislature repeal the law giving to the mortgagee or judgment creditor the immediate possession after sales of real property without any liability to account, in the appraisement law to secure fairer sales of real property on execution and to limit the recovery of a debt secured by mortgage to the property included in the mortgage. The conditions existing in the state were before the legislature. Large numbers of its citizens, many of them active and energetic business men, were retired from business or from any productive occupations because of existing deficiency judgments against them after mortgage foreclosures. The same considerations from this point of view might affect the legislative mind that could be adopted in the enactment

of a state insolvency law, and the unbroken current of judicial authority in this country now sustains the validity of such insolvency laws enacted by the states, when they do not impair prior contracts. The state is interested in the activity and capacity of its citizens, and if any considerable class of them be deprived of their capacity to engage in productive occupations or business there is so much loss to the public. Something here of the same principle as underlies the exemption laws is found. A just motive existing in the legislative intent relieves the act of any objection that it is arbitrary. The next objection that is suggested to this law is that it is class legislation, but no authority has been called to our attention which would suggest such an objection. Mortgages have been the subject of legislative control both in the terms of the contract and in the procedure enforcing the mortgage contract throughout our history. It is a general and natural division, the subject of legislation. There can be no doubt of the power of the legislature to fix the rate of interest on money. That is a matter exclusively within its policy. This rate may be made so low as to largely interfere with the power to borrow money. In a number of the states the power to mortgage a homestead is forbidden, and in the state of Texas, notably, the real estate homestead is so large that, as has been observed by some jurists, it is a practical inhibition upon the mortgage generally of real property in that state. Yet though the constitutionality of this law has been challenged, it has uniformly, so far as my examinations have extended, been sustained. I understand, without legislative sanction, the right to mortgage chattels without taking possession is denied in many jurisdictions. The rule in the state of California seems to be that only such chattels as are specified in the various legislative acts are subject to mortgage unless the possession be delivered to the mortgagee. In the case

of *Bronson v. Kinzie*, 1 How. 311, the supreme court of the United States had under consideration a law passed in the state of Illinois which provided that the equitable estate of the mortgagor should not be extinguished for twelve months after sale on decree, and which prevented any sale of the mortgaged property unless two-thirds of the amount at which the property had been valued by appraisers should be bid therefor. The question before the court was as to the impairment of existing contracts by the retroactive provisions of this statute. The court by Mr. Chief Justice TANEY declared:

" Mortgages made since the passage of these laws must undoubtedly be governed by them; for every state has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction. It may exempt any property it thinks proper from sale, for the payment of a debt; and may impose such conditions and restrictions upon the creditor as its judgment and policy may dictate. And all future contracts would be subject to such provisions; and they would be obligatory upon the parties in the courts of the United States, as well as in those of the state."

This I understand to be the established rule enforced by the supreme court of the United States.

4. The effect of the statute making the contract for specific money soluble in lawful money of the United States involves a federal question and seems to have been determined by the controlling authority—the supreme court of the United States. The power of the state to declare a legal tender is limited to gold and silver coin. All " lawful money " of the United States is not a legal tender for private obligations by the laws of the United States; but under the grant of power to coin money and regulate the value thereof the federal supreme court has, I think, decided that the question relating to final payment in private

contracts is one exclusively of federal jurisdiction and vested in congress. The legal tender and gold contract decisions, taken in connection with the recent case of *Woodruff v. State of Mississippi*, 162 U. S. 291 (16 Sup. Ct. 820), are controlling here. The jurisdiction of the federal court would not in this case have been sustained on any other principle than complete federal control of such contracts. This conclusion I think is manifestly apparent from both the majority and minority opinions given in the case. A different question would be presented in contracts made by the state or municipal corporations controlled by the state.

My conclusions are that, with the exception of the solution of the contract in suit in lawful money of the United States, the judgment of the superior court is correct.